2014 COA 72

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**William Roger TRUJILLO, Defendant–Appellant.**

**Court of Appeals No. 10CA0105**

Colorado Court of Appeals, Div. V.

Announced June 5, 2014

Certiorari Dismissed September 11, 2014

John W. Suthers, Attorney General, Nicole D. Wiggins, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Elizabeth Griffin, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE FURMAN

¶ 1 Defendant, William Roger Trujillo, appeals the judgment of conviction entered after a jury found him guilty of second degree kidnapping, robbery, third degree assault, and menacing. He contends that his convictions must be dismissed because the trial court granted the prosecution a continuance beyond his speedy trial deadline to obtain the testimony of a crucial witness. In the alternative, he contends that his convictions should be reversed because the trial court erroneously admitted—over objection—excessive evidence about gangs. Because we disagree with his first contention, but agree in part with his second contention, we reverse and remand for a new trial.

## I. The Dispute at Trial

¶ 2 The dispute at trial centered on one fundamental question: Did Trujillo or someone else commit the crimes?

¶ 3 At trial, the prosecution presented evidence of the following.

¶ 4 One evening, the victim and his friend, Marcelina Gonzales (M. Gonzales), attended a graduation party at a local bar. At approximately midnight, Trujillo and two other men, Jose Gonzalez (J. Gonzalez) (also referred to by his nickname, Pelon) and Jesus Rodriguez (also referred to by his nickname, Grumpy), entered the bar. M. Gonzales had known Trujillo and Rodriguez for years. She had dated both of them and referred to them as her "family."

¶ 5 According to the victim, at some point that night, an unidentified patron of the bar said something offensive to M. Gonzales. She immediately told Trujillo, who engaged this patron in a fight. J. Gonzalez and Rodriguez joined Trujillo in this fight and the three men were subsequently kicked out of the bar.

¶ 6 The victim and M. Gonzales left the bar when it closed. As they were driving in the victim's truck, M. Gonzales said that she wanted cigarettes, so the victim stopped by his apartment for money. When he got back in his truck, M. Gonzales was on the phone and told the victim to take her to a particular 7–Eleven convenience store. When the victim refused, she pulled out a pocketknife and demanded that he take her there. When he insisted on knowing why, she cut his hand and told someone on the phone that he was hitting her. Eventually, they made their way to the 7–Eleven.

¶ 7 The victim testified that, when they arrived at the 7–Eleven, he saw Trujillo and two other men standing in the parking lot. As soon as the victim parked his truck, M. Gonzales opened her door and ran to the men. One of the men, whom the victim later identified as J. Gonzalez, then entered the victim's driver side door and forced the victim to the middle of the bench seat of the truck, while Trujillo entered from the passenger side and began assaulting the victim. J. Gonzalez drove off with the victim and Trujillo in the victim's truck, and M. Gonzales and another man followed them in another vehicle.

¶ 8 The victim also testified that, while they were driving, Trujillo and J. Gonzalez made death threats toward him and that, at one point, they stated, "This is what happens when you hit women."

¶ 9 But, knowing that the passenger side door did not lock properly, the victim decided to escape. While the truck was going approximately thirty or forty miles per hour, the victim opened the passenger side door and jumped, taking Trujillo with him. Once they landed on the pavement and stopped skidding, the victim punched Trujillo in the face and started running.

¶ 10 As the victim ran, J. Gonzalez caught up to him in the truck and then started chasing him on foot; the victim testified that, at this moment, he remembered having a pocketknife. The victim pulled out the knife and stabbed J. Gonzalez in the face. The victim then ran and called 911.

¶ 11 At trial, M. Gonzales gave a similar account but minimized the role that Trujillo played in the crime. She testified as follows. Trujillo never entered the bar earlier in the night but was, instead, passed out in the back of a truck in the parking lot. And, Trujillo remained passed out in the back of the truck at the 7–Eleven while Rodriguez orchestrated the entire event. Rodriguez got in the passenger seat and assaulted the victim while J. Gonzalez got in the driver's side. When Trujillo woke later that morning, Rodriguez admitted to Trujillo that he had assaulted the victim.

¶ 12 M. Gonzales also testified that after the crimes Rodriguez held a knife to her throat and threatened to kill her if she talked; she believed him because "he was a very dangerous man." She also was worried about her family.

¶ 13 But, the jury later heard that M. Gonzales had initially told police, absent a few details about what happened between the bar and the 7–Eleven, a story that was consistent with the victim's.

¶ 14 The prosecution also introduced evidence that Trujillo was affiliated with the Sureños gang in order to explain (1) that M. Gonzales changed her testimony out of fear of retaliation and (2) Trujillo's motive for joining in the attack on the victim. The jury also heard considerable evidence about this gang from police officers and an expert witness. This evidence will be discussed in Part III of this opinion.

## II. Speedy Trial

¶ 15 We first consider whether Trujillo's convictions must be dismissed because the trial court granted the prosecution a continuance beyond the speedy trial deadline to obtain the testimony of a crucial witness, M. Gonzales. We conclude they should not.

¶ 16 Several requirements guide our analysis. The charges against a defendant must be dismissed if a defendant is not brought to trial on the issues raised by the complaint, information, or indictment within six months from the date of the entry of a not guilty plea. § 18–1–405(1), C.R.S.2013. But, certain delays are not included in the calculation of the six-month period, including the following:

> [t]he period of delay not exceeding six months resulting from a continuance granted at the request of the prosecuting attorney, without the consent of the defendant, if:
>
> I. The continuance is granted because of the unavailability of evidence material to the state's case, when the prosecuting attorney has exercised due diligence to obtain such evidence and there are reasonable grounds to believe that this evidence will be available at the later date.

§ 18–1–405(6)(g)(I).

¶ 17 The burden of compliance with the speedy trial statute is on the prosecution and the trial court. *People v. Roberts,* 146 P.3d 589, 593 (Colo.2006). Thus, the following must occur:

- The prosecution must make a sufficient record that all three elements of section 18–1–405(6)(g)(I) have been met. *Id.* at 593–94.
- The court must then evaluate the prosecution's statements and weigh the competing interests in reaching its conclusions. *Id.* at 594.

¶ 18 "We review a trial court's grant of a continuance pursuant to section 18–1–405(6)(g)(I) ... for an abuse of discretion." *People v. Valles,* 2013 COA 84, ¶ 21, —— P.3d —— (citing *People v. Scialabba,* 55 P.3d 207, 209 (Colo.App.2002)). We will not disturb the trial court's findings granting a continuance if the record supports these findings. *Id.*

¶ 19 The prosecution moved to continue Trujillo's trial to secure M. Gonzales's testimony. The trial court granted the continuance, concluding that the "availability of [M. Gonzales] is crucial to the People's case" and that "absent her testimony it would be difficult for the [prosecution] to succeed in this case." It also concluded that the circumstances in the case were sufficiently similar to those in *People v. Koolbeck,* 703 P.2d 673, 676 (Colo.App.1985), under which a continuance was granted. The court then reset Trujillo's trial to a date when the prosecution

anticipated M. Gonzales's plea agreement would be finalized. (That date was within six months of the continuance.)

¶ 20 Trujillo's appeal challenges (a) the prosecution's exercise of due diligence to secure M. Gonzales's testimony and (b) whether reasonable grounds existed to believe M. Gonzales's testimony would be available at a later date.

### A. Due Diligence

■ ¶ 21 We conclude that the record supports the prosecution's exercise of due diligence to secure M. Gonzales's testimony because, in its motion to reconsider the continuance, the prosecution stated:

> Defense counsel for [M. Gonzales] has represented to the Court that [she] is cooperative and willing to testify against her accomplices once her case is resolved. The plea agreement reached with [M. Gonzales] will be partially based on information she has provided in an unrelated unsolved case. The People have not been able to enter into a plea agreement as detectives have been working to corroborate the truthfulness of her statements. Detectives have acted with due diligence to investigate upon the information provided to them by [M. Gonzales]. The People have recently met with the assigned lead detective and his sergeant regarding the status of that investigation. As a result of that meeting additional detectives have been assigned to the investigation and a deadline for completion of October 5th, 2009 was agreed to.

And, at the hearing on the motion, the prosecution also stated that (1) it was close to reaching a plea agreement in M. Gonzales's case, but that the agreement was contingent on the accuracy of information she had provided in an unrelated case; and (2) it was actively working with law enforcement officials to corroborate M. Gonzales's information.

¶ 22 Yet, Trujillo argues that, in light of later precedent that the privilege against self-incrimination continues through sentencing and direct appeal, see, e.g., Mitchell v. United States, 526 U.S. 314, 325, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), the proposition

in Koolbeck that the government may complete the trial of an important witness to make him or her available is now legally incorrect. But we need not decide whether that portion of the holding in Koolbeck is still good law because (1) the trial court based its finding of due diligence on the prosecution's efforts to obtain a plea agreement to make an important witness—M. Gonzales—available and (2) the continuance lasted only until the next disposition date in M. Gonzales's case—when her plea agreement would be finalized—not until the end of her trial. Thus, the continuance here does not implicate the privilege against self-incrimination during sentencing or on direct appeal.

### B. Reasonable Grounds

■ ¶ 23 We conclude that the record supports the trial court's finding that reasonable grounds existed to believe M. Gonzales's testimony would be available at a later date because, as noted, the prosecution continually stated that it believed a plea agreement with M. Gonzales would soon be reached, after police could confirm her statements, and that this agreement would require her to testify against her accomplices. The court also spoke with M. Gonzales's attorney off the record and was informed that a tentative agreement with M. Gonzales had been reached.

¶ 24 Trujillo also argues that the trial court erroneously relied on Koolbeck for the proposition that the prosecution had reasonable grounds to believe M. Gonzales's testimony would be available at a later date by virtue of her trial. Again, we need not determine whether that portion of the holding in Koolbeck is still good law because we conclude that the court's finding that the prosecution had reasonable grounds to believe M. Gonzales would be available at a later date by virtue of its plea agreement was sufficient to meet its burden under the statute.

### III. Gang Evidence

¶ 25 We next consider whether Trujillo's convictions should be reversed because the trial court erroneously admitted—over objec-

tion—excessive evidence about gangs. We conclude they should.

¶ 26 Trujillo filed two pretrial motions: one to exclude the testimony of any gang expert and one to exclude any mention of his gang affiliation, contending such evidence was irrelevant under CRE 402 and unduly prejudicial under CRE 403. He also alleged that this evidence should be excluded under CRE 404(b). In response, the prosecution filed a "Notice and Motion for Res Gestae Evidence" to admit evidence of Trujillo's membership in the "Sureños" gang and to show "motive for the crime itself" because it was done "in retaliation for a perceived wrong" done to M. Gonzales and necessary to explain her "inconsistent statements."

¶ 27 At a hearing on these motions held on the morning of trial (before a different judge), the prosecution stated that the gang evidence was relevant to show Trujillo's motive to protect M. Gonzales or to retaliate against the victim because he threatened to call the police regarding M. Gonzales.

¶ 28 The judge agreed with the prosecution, ruling that the evidence showed that this was gang activity, in the form of retaliation or collective assault, and that gang affiliation evidence would give the jury a clearer understanding of the events that occurred. The judge limited the gang expert to testifying "about [his] general knowledge about gangs and the way they identify one another and gang culture," but not to "offer an opinion as to whether any of these individuals, including [Trujillo], [was a] member[ ] of any particular gang."

¶ 29 At trial, before calling the gang expert, the prosecution introduced gang evidence through several witnesses.

▲ *The Police Detective Gang Specialist*

¶ 30 A police detective told the jury he was "certified as a gang specialist for the last ten years" and that his primary duty was as a "gang detective for the east side of town." As a "gang specialist," he received "additional specialized training in gangs, gang cases, gang investigation" and "went to additional gang training every year." The detective told the jury, "I had a pretty good idea who

two of the suspects were due to [their] monikers," and that the third also "was in our system." The following colloquy then took place:

[Prosecutor]. And you stated that you were familiar with a couple of the names that [M. Gonzales] gave you from prior contacts?

[Detective]. Correct.

Q. And that was—who were those people?

A. [Rodriguez] and [Trujillo].

Q. And from your prior contacts with them and as your duties as a gang officer, did you know them to be involved in a gang?

A. Yes.

The court sustained an objection and instructed the jury to disregard the last question and answer.

¶ 31 But, after pointing out Trujillo in court, the detective identified Trujillo's moniker as "Diablo or Big Diablo." He then testified:

[Prosecutor]. And after learning their names, you presented the lineup to [M. Gonzales]?

[Detective]. Correct.

Q. What was her demeanor like when you were presenting the lineup to her?

A. Terrified.

Q. Was she crying?

A. Yes.

Q. Did it seem like she was reluctant to identify these people?

A. At first she didn't want to look at 'em. She kept repeating over and over, "I'm dead. I'm dead. I'm dead."

¶ 32 After the detective concluded his testimony, and following the testimony of several other witnesses, the court, based on *People v. Martinez*, 24 P.3d 629, 634 (Colo.App.2000), gave the following instruction to the jury on the second day of the trial:

Guilt may not be inferred from mere association. Membership in a gang is not itself a crime; therefore, your decision shall not be affected by evidence, without more, that the defendant was a member of a gang. You are expected to carefully and impar-

tially consider all of the evidence and follow the laws as stated by the Court.

### ▲ M. Gonzales and "Green Light," the Teardrop Tattoo, and the Shooting of Gizmo

¶ 33 M. Gonzales then testified. She denied membership in a gang, but testified that her brother and other friends were in IIPL, a subset of the Sureños gang. She testified that Rodriguez was a Sureños and "thought he was a shot caller." M. Gonzales also said that Rodriguez had threatened her and her family and "put a green light on IIPL." She understood "green light" to be a threat to have someone killed. M. Gonzales also mentioned that gang members who go to prison get a teardrop tattoo.

¶ 34 She told the jury that she was frightened at the time of her first statement, in part, because she had "just witnessed someone getting killed." She told the jury she began carrying a knife after she saw someone called "Gizmo" get shot and "killed in front of [her]." M. Gonzales also mentioned going to a bar, Twisters, around the time of this shooting.

¶ 35 During a recess, the court told the jurors, "I [ ] understand that at least one juror has expressed some concerns about your names being discussed here in open court, so from this point forward I will not call anybody by name." The court told them that the parties had returned the questionnaires and that the court would "make sure that no one else [would have] knowledge as to [a juror's] identity other than by [the] juror number."

¶ 36 Then, a juror handed the court a note which read, "[M. Gonzales] mentioned the bar Twisters. How much are they affiliated with Twisters? I am connected with some people at Twisters; therefore, I am concerned as they all know me."

¶ 37 Outside the jury's presence, M. Gonzales testified that she had been to Twisters, that Rodriguez was there "the day they buried Gizmo," and that "that's when he said he's gonna put a green light towards IIPL." Although the prosecution told the court that the reference to Twisters was "not related to

this case," the court did not answer the juror's question.

¶ 38 After reconvening from a lunch recess, the court received a note from a different juror who was concerned about "juror[ ] names revealed in open court ... since [Trujillo] was in the courtroom yesterday, and he is affiliated with a gang." In this note, the juror stated that she did not "have a prejudice against gangs," and could remain fair, but "was mainly concerned for [her] personal safety, and safety for [her] family, [s]ince [Trujillo] heard names yesterday." The juror asked, "What provisions are made for anonymity[?]" The court did not respond to this juror's note.

¶ 39 The prosecution then discussed its intent to offer, at the close of testimony, exhibit 43—a picture of Trujillo's face showing a teardrop tattoo near Trujillo's left eye—and exhibit 44—a picture of Trujillo's chest showing a "Pocos Pero Locos" tattoo. Trujillo renewed his relevance/prejudice objection to exhibit 44, but the court overruled his objection.

¶ 40 The prosecution then recalled the detective and asked him, as a "gang specialist," what "green light" means. The detective testified that a green light is an instruction given by a "shot caller" in a gang to immediately assault or kill someone from another gang on sight. The prosecution also asked the detective what IIPL meant, based on his "training and experience," and the detective testified that it referred to the Pocos Pero Locos, a subset of the Sureños gang.

### ▲ The Police Officer

¶ 41 The prosecution then called a police officer who testified that she was a member of the Community Impact Team, a "unit that focuses on violent crimes, specifically guns, gangs, and drugs," and targets "violent offenders." She testified about taking the victim's statement, which did not mention gangs, after the criminal incident. Following this testimony, the jury had a question for the police officer about her knowledge of "gang activity, members, and monikers in the area." But, the court did not ask this question.

▲ *The Gang Expert*

¶ 42 The prosecution then called the gang expert to testify. Trujillo entered a "continuing objection" to this testimony. He stated that he did not "believe that there [was] enough in this case that a gang expert would be relevant in that the probative value [was] outweighed by the prejudice of [the gang expert] testifying." And, he objected that there had not "been enough said in this case to say that this is something that involves a gang" and that "the gang identity of really any of these individuals" was unknown. He then asked, "[I]f [M. Gonzales] is not in a gang, and [the victim] is not in a gang, how is this a gang case?" He stated that the gang expert's testimony would "not [be] very probative, and ... it's highly prejudicial, and ... it will confuse the jurors, and ... it will also waste some of the Court's time."

¶ 43 The trial court noted and overruled Trujillo's continuing objection.

¶ 44 The gang expert then testified. His testimony addressed several areas of the Sureños gang: the organizational structure and size of the Sureños; the Sureños gang culture; and the rules of the Sureños.

• *The Organizational Structure and Size of the Sureños*

¶ 45 The gang expert testified that the Sureños gang is a Latino street gang from southern California that is governed by a highly organized prison gang known as the Mexican Mafia. He testified that there are hundreds of subsets of the Sureños throughout the country, including the "Pocos Pero Locos" subset, or "II–PL," which means "Few but Crazy." He also testified that there are over four hundred confirmed Sureños in Colorado Springs, making it the largest local street gang.

¶ 46 The gang expert also testified that a "shot caller" is a boss "affiliated with high members of the Mexican Mafia" with authority to make decisions.

• *The Sureños Gang Culture*

¶ 47 The gang expert testified that members of the Sureños refer to each other as "homey, brother" or "family." When they join the gang, they typically have the name of their street gang or subset tattooed on their back or chest. But, he also testified that the gang would remove a "Pocos Pero Locos" tattoo with a knife or razor if this tattoo was found on a nonmember to make the nonmember "suffer." And, the gang expert testified that the Sureños would kill anyone who tried to quit the gang.

¶ 48 He then discussed what crimes Sureños gang members generally commit:

[Prosecutor]. Is the [Sureños] gang here [in Colorado] known for committing certain types of crimes?

[Gang Expert]. Absolutely.

Q. What kind of crimes are they known for committing?

A. Mainly it's illegal distribution of narcotics. That's where their money is being made. But with that, you have the violence that comes along with that, selling drugs in other people's locations or having hurt feelings because of whatever drug transaction.

So, typically, you see homicides, home invasions—which is really big—assaults; and pretty much any crime that you can think of—even, theft, and motor vehicle theft. Identity theft.

Q. Do [Sureños] have a reputation amongst other gangs for anything? Do they have a reputation of violence, for example?

A. Yes.

Q. And based on your investigations and involvement with gang-related crimes, does there always have to be a motive for the acts of violence that they commit?

A. It depends on what the crimes are. Some of the crimes it could be as simple as, Hey, you looked at me wrong, or you bumped into me at a rap concert or down at a local bar. It could be something as small as that, or it could be as big as something like a hit came from an official in the prison system saying that this person is green lighted, so—

Q. So it could be at the request of another gang member?

A. Absolutely.

### • *The Rules of the Sureños*

¶ 49 The gang expert also testified that the Sureños have four major rules: (1) a member cannot be a homosexual; (2) a member cannot be a coward; (3) a member cannot disrespect other Sureños; and (4) a member cannot be a snitch.

¶ 50 Given these rules, the gang expert explained that if one member of the Sureños is fighting, "everybody has to join in" because it would be cowardly and disrespectful not to join in the fight and that a member who did not join in would be punished. He also testified that people who disrespect the gang "are in trouble."

¶ 51 Then, the expert testified about "snitches" who testify against gang members or who cooperate with the police:

[Prosecutor]. We were talking earlier about the rule that you don't snitch.

What are the consequences of a gang member snitching on another—someone in their gang?

[Gang Expert]. · That's the ultimate betrayal, so that person would definitely be disciplined. And I would probably think in most situations, there would be a retaliation attack, serious bodily injury, even death.

Q. And would that be limited to that person?

A. No. No.

Q. Who else would be in danger?

A. Well, we hear it quite often in investigations like this when we try to flip, which is we try to use a person that we recently arrested as an informant, and they are deathly afraid of family members, and they always say, I have children, I have a mother, I have a father. So they feel that there could be a retaliation against family members.

. . . .

Q. In the rank of violating the code of silence or not snitching, is it worse even yet if the person who provided information to law enforcement actually went forward and testified?

A. Regardless, once you are labeled as a snitch, which is a derogatory term used to say telling on someone, once you are considered a snitch, you are a snitch.

So the consequences are going to be the same no matter what.

. . . .

Q. Is there any way to, in a sense, mitigate?

Once you become a snitch and cooperated with law enforcement, is there any way that you could mitigate the damage?

. . . .

A. That, I really don't know. I can't imagine unless somehow this individual that provided information—the informant—was able to somehow convince upper leaders to spare that person's life. But that's the ultimate betrayal, that's why there is such a great criminal enterprise.

Q. Do you think it would be reasonable for them to attempt to change their story?

A. Well, what we often find—when we arrest someone and we put the handcuffs on someone, and we set them at the interview room and we start laying out what the case is, at that point they want to save themselves—that loyalty, the family, and everything is out the window, because they are in that situation right now, and they realize, I need to help myself out.

Then, as it progresses, then they realize, [w]ow, I made a huge mistake, because when the paperwork comes out, they realize people are going to find out that they snitched. So then they start worrying about it, they start worrying about their family members and their personal safety, but they really can't undo that damage.

Q. But they often try?

A. Yes.

Q. By changing their statements?

A. A lot of times, yes.

¶ 52 After the gang expert's testimony, the prosecution introduced People's Exhibits 43 and 44, the photographs of Trujillo's teardrop and "Pocos Pero Locos" tattoos.

¶ 53 In closing arguments, the prosecution referred to Trujillo and his associates as M. Gonzales's "enforcers." The prosecution said that M. Gonzales was "protective of them, they are protective of her. They were will-

ing to do anything she asked them to do without question. It's the type of mentality that you see in gangs. It's the type of mentality and loyalty and protection that people seek out in gangs."

¶ 54 During deliberations, a juror again gave the court a note that requested confidentiality, expressed a concern about her safety due to possible retaliation, and asked that she be dismissed so Trujillo could have a fair trial. The court spoke to this juror away from the hearing of the other jurors, saying that it could not guarantee that there would be no retaliation, but also advising her that it had never heard of a juror being retaliated against and that she could have a deputy walk her out of court if she wished. In response, this juror agreed that she could decide the case solely on the evidence and law and then returned to deliberate.

·¶ 55 On appeal, Trujillo contends, among other things, that the trial court erred by (1) refusing to exclude the gang expert's testimony because it was undisclosed in violation of Crim. P. 16 and (2) admitting irrelevant and unhelpful gang-related evidence because any probative value was substantially outweighed by the risk of unfair prejudice. Because we conclude that the trial court erred in admitting certain parts of gang-related evidence and reverse on this basis, we do not address the issue of alleged violations of Crim. P. 16.

### A. Admissibility of Gang Evidence

■ ¶ 56 Several requirements guide our analysis. "All relevant evidence is admissible unless otherwise provided by constitution, statute, or rule." *Yusem v. People,* 210 P.3d 458, 463 (Colo.2009). Relevant evidence is evidence that has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Id.* (quoting CRE 401). But, relevant evidence can be excluded if (1) its probative value is substantially outweighed by the danger of unfair prejudice, *id.* (citing CRE 403), or (2) it is used to prove the character of a person in order to show that he or she acted in con-

formity with that character on a particular occasion, *id.* (citing CRE 404(b)).

¶ 57 Courts across the country have determined that gang affiliation evidence is relevant and admissible:

- as res gestae evidence to explain a defendant's conduct in a criminal episode in which gang members acted in concert with one another, *see Martinez,* 24 P.3d at 633;
- as other act evidence under Rule of Evidence 404(b), *see State v. Yarbrough,* 151 Wash.App. 66, 210 P.3d 1029, 1036–37 (2009) (holding gang affiliation evidence to be relevant to prove motive under Rule 404(b)); and
- to explain a witness's change in statement or reluctance to testify, *see People v. James,* 117 P.3d 91, 94 (Colo.App. 2004).

¶ 58 In *People v. Quintana,* 882 P.2d 1366, 1371–72 (Colo.1994), our supreme court held that "it is incumbent upon the reviewing court to investigate potential theories of admissibility that are either argued on appeal or that were relied on by the trial court in admitting the evidence in question."

¶ 59 As noted, the parties on appeal disagree over whether the gang evidence is relevant and admissible. On the one hand, the People argue that all of the gang evidence is admissible as res gestae evidence and to explain why M. Gonzales changed her story. On the other hand, Trujillo argues that much of the testimony was not relevant and was nothing more than impermissible propensity evidence in violation of CRE 404(b).

¶ 60 We review the admission of evidence for an abuse of discretion. *See Yusem,* 210 P.3d at 463; *People v. Griffiths,* 251 P.3d 462, 466 (Colo.App.2010). A trial court abuses its discretion when its ruling "is manifestly arbitrary, unreasonable, or unfair." *Griffiths,* 251 P.3d at 466.

¶ 61 Although the gang evidence was considerable, most of Trujillo's objections at trial and on appeal concern the unreasonableness or unfairness of the jury hearing

- the gang expert's testimony about the organizational structure and size of the

Sureños, the Sureños gang culture, and the rules of the Sureños; and

- M. Gonzales's gang-related testimony about the meaning of "green light," the meaning of the teardrop tattoo, and the shooting of Gizmo.

We limit our analysis to this evidence, and address the three potential theories of admissibility previously discussed: (1) res gestae evidence; (2) CRE 404(b) other act evidence; and (3) relevant "snitch" evidence about a witness's change in statement.

### 1. Res Gestae Evidence

¶ 62 We conclude that parts of both the gang expert's testimony and M. Gonzales's testimony were inadmissible as res gestae evidence.

■ ¶ 63 In Colorado, res gestae evidence is

matter incidental to the main fact and explanatory of it, including acts and words which are so closely connected therewith as to constitute a part of the transaction, and without a knowledge of which the main fact might not be properly understood. They are ... the circumstances, facts and declarations which grow out of the main fact, are contemporaneous with it and serve to illustrate its character.

*People v. Asberry*, 172 P.3d 927, 932 (Colo. App.2007) (quoting *Woertman v. People*, 804 P.2d 188, 190 n. 3 (Colo.1991)); *see also People v. Greenlee*, 200 P.3d 363, 368 (Colo. 2009) (res gestae evidence is "generally linked in time and circumstances with the charged crime, forms an integral and natural part of an account of a crime, or is necessary to complete the story of the crime for the jury" (internal quotation marks omitted)); *People v. Rollins*, 892 P.2d 866, 872–73 (Colo. 1995).

■ ¶ 64 The gang expert's testimony did not satisfy this res gestae definition because the prosecution did not show the connection between the charged crimes and the following evidence:

- the Sureños gang is governed by a highly organized prison gang known as the "Mexican Mafia";

- a "shot caller" is a boss "affiliated with high members of the Mexican Mafia" with authority to make decisions;

- how the gang would remove a "Pocos Pero Locos" tattoo with a knife or razor if this tattoo was found on a nonmember to make the nonmember suffer;

- how the Pocos Pero Locos kill members who try to quit the gang;

- the Sureños committing narcotics distribution, homicides, home invasions, and thefts; and

- the rules of the Sureños.

Thus, we conclude the gang expert's testimony about the organizational size and structure of the Sureños, the Sureños gang culture, and the rules of the Sureños was inadmissible as res gestae evidence. *See Asberry*, 172 P.3d at 932.

¶ 65 Likewise, M. Gonzales's gang-related testimony did not satisfy the res gestae definition because the prosecution did not show the connection between the charged crimes and the following evidence:

- the meaning of "green light";

- the meaning of the teardrop tattoo; and

- the shooting of Gizmo.

Thus, we conclude this was also inadmissible as res gestae evidence. *See Asberry*, 172 P.3d at 932.

¶ 66 But, that does not end our analysis. Because the portions of the expert's testimony and M. Gonzales's testimony discussed above were evidence of other crimes, wrongs, or acts admitted to show motive, we next address the admissibility of this evidence under CRE 404(b); *see generally Greenlee*, 200 P.3d at 368 (holding that CRE 404(b) "limits the admissibility" of relevant evidence).

### 2. CRE 404(b) Other Act Evidence

¶ 67 We conclude that parts of both the gang expert's testimony and M. Gonzales's testimony were inadmissible under CRE 404(b).

¶ 68 "[E]vidence of other crimes, wrongs, or acts," unrelated to the charged offense, is admissible in some circumstances. *Yusem*, 210 P.3d at 463; *see* CRE 404(b) ("Evidence of other crimes, wrongs, or acts is not admis-

sible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive...."); *Martinez,* 24 P.3d at 633.

■■ ¶ 69 Other act evidence differs from res gestae evidence because it "generally occurs at different times and under different circumstances from the charged offense." *Quintana,* 882 P.2d at 1372. Thus, "evidence is properly designated" as other act evidence if it "involves a separate and distinct episode wholly independent from . the offense charged," even if it is "similar in nature" to the charged offense. *Id.; see also Masters v. People,* 58 P.3d 979, 1000 (Colo.2002) (interpreting *People v. Mendoza,* 876 P.2d 98, 103 (Colo.App.1994) (holding that evidence of gang affiliation was admissible as motive where it was offered not to prove that defendant was more likely to kill because he was a gang member, but because his membership in a particular gang established a motive for why he was more likely to murder a particular victim after deliberation)); *People v. Marquantte,* 923 P.2d 180, 184 (Colo.App. 1995) (analyzing evidence of participation in gang initiation under CRE 404(b) for state of mind and motive).

¶ 70 While few Colorado courts have analyzed gang affiliation evidence as other act evidence under CRE 404(b), other state courts have done so, under their comparable rules of evidence, when the evidence involved a crime separate and distinct from the charged offense and could be viewed as evidence about another crime, wrong, or act. *See, e.g., Yarbrough,* 210 P.3d at 1036–37 (holding that gang affiliation and a prior altercation were admissible under Washington's Rule of Evidence 404(b) to establish motive and mental state); *Utz v. Commonwealth,* 28 Va.App. 411, 505 S.E.2d 380, 384 (1998) ("[A] juror might associate a defendant with such [a gang] affiliation as a person of bad character or someone prone to aggressive or violent behavior. Therefore, we analyze the admissibility of such evidence under the prior bad act standard."); *R.D.H. v. State,* 775 So.2d 248, 252 (Ala.Crim.App.1997) ("Evidence of a defendant's affiliation with the Ku Klux Klan, like evidence of a defendant's association with a 'gang,' may properly be considered to be evidence of collateral bad acts.").

■ ¶ 71 We agree with these state court decisions and conclude that evidence related to gang affiliation that "involves a separate and distinct episode wholly independent from the offense charged," *Quintana,* 882 P.2d at 1372, may be admissible under the CRE 404(b) prior act standard.

¶ 72 Still, because "gangs are regarded with considerable disfavor by our society," gang-related evidence must be "admitted with care." *People v. Morales,* 359 Ill.Dec. 160, 966 N.E.2d 481, 492 (Ill.App.Ct.2012) (citing *People v. Strain,* 194 Ill.2d 467, 252 Ill.Dec. 65, 742 N.E.2d 315 (2000)); *see People v. Roman,* 1 N.E.3d 552, 559, 376 Ill.Dec. 840 (Ill.App.Ct.2013) ("There may be a strong prejudice against street gangs, ... so a trial court should take great care when exercising its discretion to admit gang-related testimony." (citing *People v. Davenport,* 301 Ill.App.3d 143, 234 Ill.Dec. 169, 702 N.E.2d 335 (1998))). Hence, "courts must be vigilant in guarding against the improper use of gang affiliation evidence 'as a backdoor means of introducing character evidence by associating the defendant with the gang and describing the gang's bad acts.' " *Gutierrez v. State,* 423 Md. 476, 32 A.3d 2, 13 (2011) (quoting *State v. Torrez,* 146 N.M. 331, 210 P.3d 228, 235 (2009)); *see People v. Sanchez,* 58 Cal.App.4th 1435, 69 Cal.Rptr.2d 16, 24 (1997) ("Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense."); *People v. Albarran,* 149 Cal.App.4th 214, 57 Cal.Rptr.3d 92, 103 (2007) (lengthy testimony about other gang members and other gang crimes, including threats to kill police officers had little or no bearing on the guilt of defendant and "approached being classified as overkill").

¶ 73 To be admissible under the CRE 404(b) prior act standard, the gang evidence must comply with the well-known four-prong test articulated in *People v. Spoto,* 795 P.2d 1314, 1318 (Colo.1990). We review each prong below. *See Yusem,* 210 P.3d at 463.

### a. Material Fact

¶ 74 The first prong of the *Spoto* test is that "the evidence must relate to a material fact; that is, a fact that is of consequence to determination of the action." *Id.* (internal quotation marks omitted). A fact that is of consequence to determination of the action includes "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." CRE 404(b); *see Yusem,* 210 P.3d at 463.

¶ 75 To determine this, we ask whether the other act evidence can be used to prove "(1) actual elements of the charged offense" or "(2) intermediate facts, themselves probative of ultimate facts." *Yusem,* 210 P.3d at 464. "So long as the purposes for which the prior act evidence is offered are somehow probative of an ultimate fact, the first prong is satisfied." *Id.*; *see also People v. Weston,* 353 Ill.Dec. 636, 956 N.E.2d 498, 504 (Ill.App.Ct.2011) ("To ensure a careful exercise of discretion, a trial court should require the prosecution to demonstrate a clear connection between the crimes and the gang-related testimony.").

¶ 76 We conclude that the gang expert's testimony about the Sureños gang culture and the gang's rules against cowards and disrespect could relate to Trujillo's motive, a material fact, because this testimony could help explain why Trujillo may have joined J. Gonzalez, a fellow Sureños member, to kidnap and assault the victim. *See Spoto,* 795 P.2d at 1318. This testimony could also help explain that this incident was gang retaliation—Trujillo avenging a wrong done to M. Gonzales.

¶ 77 But, the gang expert's testimony about the organizational structure and size of the Sureños, and M. Gonzales's gang-related testimony about the meaning of "green light," the meaning of the teardrop tattoo, and the shooting of Gizmo are not probative of Trujillo's motive and, thus, do not relate to his mental state. *See Yusem,* 210 P.3d at 463. Accordingly, we conclude that this evidence did not relate to a material fact and was inadmissible under the first prong of the *Spoto* test.

### b. Logical Relevance

¶ 78 The second prong is that "the evidence must be logically relevant." *Id.* at 463.

¶ 79 To determine this, we ask whether the evidence "has *any* tendency to make the existence of the material fact more probable or less probable than without the evidence." *Id.* at 464–65. We also "determin[e] the inferences that can be drawn from the prior act evidence" and "give the evidence the maximum value requested by the People." *Id.* at 465; *see Sanchez,* 69 Cal.Rptr.2d at 24 ("Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.").

¶ 80 We conclude that the gang expert's testimony about the Sureños gang culture and the gang's rules against cowards and disrespect is logically relevant to Trujillo's motive because it makes it more probable that he joined J. Gonzalez in committing a violent assault and kidnapping because, as a gang member, he was required to do so. *See Spoto,* 795 P.2d at 1318.

### c. Inference Independent of Bad Character

¶ 81 The third prong is that "the logical relevance must be independent of the prohibited intermediate inference that the defendant committed the crime charged because of the likelihood that he acted in conformity with his bad character." *Yusem,* 210 P.3d at 463.

¶ 82 To determine this, we ask whether " 'the logical relevance of the proffered evidence depends upon an inference that a person who has engaged in such misconduct has a bad character and the further inference that the defendant therefore engaged in the wrongful conduct at issue.' " *Id.* at 466 (quoting *Spoto,* 795 P.2d at 1318); *see also Albarran,* 57 Cal.Rptr.3d at 103. On review, we "focus[ ] on the maximum value that can be given the prior act evidence." *Yusem,* 210 P.3d at 466.

¶ 83 We agree with the People that the gang expert's testimony about the rules against cowards and disrespect is relevant to

show that Trujillo followed the rules and therefore is independent of the prohibited inference that Trujillo has a bad character and acted in conformity with that character.

¶ 84 Yet, the People also contend the expert's testimony is relevant to show Trujillo's motive—whether he "exacted revenge for a perceived wrong done to another associated with the gang"—and thus, we assume this to mean is independent of the prohibited inference that Trujillo has a bad character and acted in conformity with that character. The People explain that M. Gonzales "is affiliated with the gang, [the victim] allegedly hit her, and how [the victim] had [to] pay because he harmed a fellow gang member." We disagree. A jury could not reasonably conclude that Trujillo committed the charged crimes without relying on the impermissible inference that he, as a member of the Sureños, did so because he and his fellow gang members had engaged in similar violent acts in the past. Evidence that M. Gonzales was a member of the Sureños gang was minimal, and the statement to the victim during the assault, "this is what happens when you hit women," does not indicate that the assault was gang-related. We also note that the gang expert did not mention that retaliation was a gang-related rule. Instead, the expert testified extensively about the violent crimes Sureños members commit, including killing members who try to quit the gang, narcotics distribution, homicides, and theft. Accordingly, the inference that may be drawn from the remaining gang expert's testimony is impossible to distinguish from the inference that Trujillo acted in conformity with a bad character and is inadmissible under the third prong of the *Spoto* test.

#### d. CRE 403

¶ 85 The fourth prong of the *Spoto* analysis is that "the probative value of the evidence must substantially outweigh the danger of unfair prejudice." *Yusem*, 210 P.3d at 463. On review, we do not disturb the trial court's admission of the evidence absent an abuse of discretion, and we "assume the maximum probative value and the minimum unfair prejudice to be given the evidence." *Id.* at 467.

¶ 86 Giving the maximum probative value to the gang expert's testimony about the rules against cowards and disrespect, we conclude this evidence was properly admitted. The expert's testimony revealed that "if one of the members is fighting, regardless of the reason, it's basically everybody has to join in" and that a member would be "punished" if he or she did not join the fight. This evidence thus makes it more probable that Trujillo was motivated to join the assault because he was following the rules, instead of simply acting like a violent gang member. *See id.*

#### 3. Relevant "Snitch" Evidence

¶ 87 Citing *James*, 117 P.3d 91, the People contend that the gang expert's "snitch" evidence was relevant "to explain a witness's change in statement or reluctance to testify." While it may have been relevant for this purpose, the jury had already heard M. Gonzales explain her fear of retaliation and the actual threat Rodriguez made against her and her family. The "snitch" evidence was thus not necessary to explain why M. Gonzales changed her statement or was reluctant to testify. Because of the unduly prejudicial nature of gang affiliation evidence, we conclude that the danger of unfair prejudice substantially outweighed the legitimate probative value of this evidence. *See* CRE 403. Thus, we conclude the gang expert's "snitch" evidence was improperly admitted.

¶ 88 Having determined that the trial court abused its discretion in admitting parts of the gang expert's and M. Gonzales's testimony, "the question is then whether the error warrants reversal." *People v. Beilke*, 232 P.3d 146, 152 (Colo.App.2009) (citing *Liggett v. People*, 135 P.3d 725, 733 (Colo.2006)). A trial court's error in admitting evidence of prior bad acts is reversible unless it is harmless. *People v. Herron*, 251 P.3d 1190, 1195–96 (Colo.App.2010).

#### B. Harmless Error

¶ 89 The People contend that, even if the trial court erred in admitting some of the gang affiliation evidence, "the fact that [the

victim] expressly identified [Trujillo] as the man who assaulted him and carjacked him is sufficient evidence of guilt rendering the error ... harmless." We disagree.

¶ 90 Under the nonconstitutional harmless error rule, a reviewing court determines if "there is a reasonable probability that the error contributed to the defendant's conviction." *Yusem,* 210 P.3d at 469 (internal quotation marks omitted); *accord People v. Casias,* 2012 COA 117, ¶ 61, 312 P.3d 208. To obtain a reversal, then, Trujillo must establish "a reasonable probability that the other bad acts evidence contributed to his conviction." *Casias,* ¶ 62 (internal quotation marks and alterations omitted). A "reasonable probability" means that there is a "probability sufficient to undermine confidence in the outcome of the case." *Id.* at ¶ 63.

¶ 91 To determine the effect of improperly admitted bad acts evidence, we consider a number of factors, namely, " 'the overall strength of the state's case, the impact of the improperly admitted or excluded evidence on the trier of fact, whether the proffered evidence was cumulative, and the presence of other evidence corroborating or contradicting the point for which the evidence was offered.' " *Id.* at ¶ 64 (quoting *State v. Martin V.,* 102 Conn.App. 381, 926 A.2d 49, 54 (2007)).

¶ 92 At trial, the victim testified that Trujillo was among the group of men that kidnapped and assaulted him. But, M. Gonzales testified that Trujillo was not among this group, stating instead that he was passed out in a vehicle in the 7–Eleven parking lot during the kidnapping and assault.

¶ 93 Given this conflicting testimony about the central issue at trial—whether Trujillo or someone else committed the crimes—and because the gang evidence so permeated the trial and appeared to have an actual effect on the jury's ability to fairly decide this case, we conclude that there is a reasonable probability that the improperly admitted gang evidence contributed to Trujillo's conviction. *Casias,* ¶ 61; *see Yusem,* 210 P.3d at 470 ("[T]he evidence did not overwhelming[ly] favor the People: the case was dependent on the credibility of conflicting witness testimony."). Although the court gave a limiting instruction to the jury based on the instruction in *Martinez,* 24 P.3d at 634, this limiting instruction did not address the impermissible inference that Trujillo committed the charged crimes because he was acting like a violent Sureños gang member. Thus, this instruction did not alleviate the specific harm resulting from the overwhelming nature of the gang evidence. *See Yusem,* 210 P.3d at 468. Accordingly, we cannot say with fair assurance that the error in this case did not substantially influence the verdict. *Id.*

## IV. Conclusion

¶ 94 We conclude the trial court erred in admitting the gang expert's extensive testimony about the organizational structure and size of the Sureños gang, the violent nature of the Sureños gang culture, and the gang rule against snitching, and M. Gonzales's testimony about the meaning of "green light," the meaning of the teardrop tattoo, and the shooting of Gizmo. We therefore need not address Trujillo's other contentions on appeal.

¶ 95 The judgment is reversed, and the case is remanded for a new trial.

JUDGE GRAHAM and JUDGE MILLER concur.