22CA0448 Peo v Muniz 10-24-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0448
Adams County District Court No. 21CR670
Honorable Priscilla J. Loew, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Steven Ray Muniz,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE PAWAR
Tow and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Mark G. Walta, Alternate Defense Counsel, Littleton, Colorado, for Defendant-
Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Steven Ray Muniz, appeals the judgment of conviction entered after a jury found him guilty of two counts of first degree murder.  We affirm.

## I.     Background

¶ 2     This case arises from a shooting that occurred outside a bar whose regular customers include members of the North Side Mafia (NSM) gang.  The evidence presented at trial showed that Muniz, a respected member of NSM, was at the bar with family members and friends, some of whom were also NSM-affiliated, including Robert Manzanares.  Three security guards, including Bogdan Tocarciuc, were on duty.  The bar was equipped with a video surveillance system that monitored portions of the bar's interior and exterior.

¶ 3     One of the victims, William Keith Ames, arrived at the bar with Marcos Garfio and other friends and family members.  After some time, one of Muniz's friends, Brandon Johns, began conversing with Garfio and the conversation became animated.  While details were disputed at trial, surveillance video showed Muniz approach with a group of individuals and punch Garfio.

¶ 4     Security escorted Garfio out of the bar.  Ames exited a few seconds later, followed by Muniz and several others.  The

1

disagreement escalated once outside, and one of the security guards deployed pepper spray. According to video surveillance and audio taken from a nearby doorbell camera, five seconds after the pepper spray was deployed, Muniz fired four shots. Two bullets hit Ames and two hit Jessica Ybarra, another bar patron who happened to be in the line of fire. Both victims died from their injuries.

¶ 5 Tocarciuc ran after Muniz with his gun drawn. Another shot was fired from Muniz's vicinity in Tocarciuc's direction, missing him. Muniz then left the scene with Manzanares.

¶ 6 The prosecution charged Muniz with two counts of first degree murder with intent after deliberation, two counts of first degree murder with extreme indifference, and one count of attempted first degree murder. At trial, it presented evidence that all five shots were fired from a handgun with an extended magazine, and Muniz was captured on video holding the handgun. Muniz testified that he shot Ames in self-defense or defense of others after seeing Ames cock a gun and point it at a group of people, including Muniz's friends and family. He testified that the last shot, toward Tocarciuc, happened accidentally when he tried to unload the gun.

2

¶ 7    The jury found Muniz guilty of all four counts of first degree murder and not guilty of attempted murder.

¶ 8    On appeal, Muniz argues that law enforcement and the prosecution collectively deprived him of a fair trial by destroying material evidence and engaging in prosecutorial misconduct. He further asserts that the trial court improperly admitted evidence of gang affiliation, made unfair evidentiary rulings, and placed unreasonable time restrictions on his ability to present a defense. Finally, Muniz argues that cumulative error warrants a new trial.

## II.    Destruction of Evidence

### A.    Applicable Law

¶ 9    To establish a due process violation based on the state's failure to preserve potentially exculpatory evidence, the defendant must prove that (1) the state suppressed or destroyed the evidence; (2) the evidence had an exculpatory value that was apparent before it was destroyed; and (3) he was unable to obtain comparable evidence by other reasonably available means. *People v. Eason*, 2022 COA 54, ¶ 37. Exculpatory evidence is evidence tending to establish a defendant's innocence. Black's Law Dictionary 698 (12th ed. 2024). It includes evidence that "bears on the credibility

3

of a witness the prosecution intends to call at trial." *People v. Braunthal*, 31 P.3d 167, 174 (Colo. 2001).

¶ 10    Alternatively, if the evidence in question wasn't apparently exculpatory, but only potentially useful, a defendant may establish a due process violation if he shows that the state acted in bad faith. *Eason*, ¶ 38.

¶ 11    In evaluating a due process claim based on destruction of evidence, we review the trial court's factual findings for clear error and its legal conclusions de novo. *See People v. Abdu*, 215 P.3d 1265, 1270 (Colo. App. 2009).

### B.    Additional Facts

¶ 12    As part of their investigation, police took possession of the bar's video surveillance system. They successfully recovered twenty minutes of video capturing some of the altercation inside the bar and some of what occurred outside immediately before and after the shooting, but they received an error message when they attempted to download the video in its entirety. They then disassembled the system and attempted to extract data from the hard drive, but no additional footage was available. When they attempted to access

the system's contents a few months later, they discovered that all of the data was missing or inaccessible.

¶ 13    Before trial, Muniz moved to dismiss the charges based on the state's failure to preserve the entirety of the surveillance video. Following a hearing, the trial court issued a written order finding that "while law enforcement knew there was exculpatory information on the videos," they attempted to preserve the entire contents of the video surveillance system and did not intend to destroy any evidence.  Because Muniz did not establish bad faith, the court denied Muniz's motion.

## C.    Discussion

¶ 14    Muniz argues the trial court erred by considering whether the police acted in bad faith after determining the lost surveillance video was apparently exculpatory.  He further asserts that his due process rights were violated because the lost video would have conclusively established whether Ames and Garfio were searched when they arrived at the bar and what the searches yielded.  We are not persuaded.

¶ 15    As an initial matter, it is unclear from the record whether the unavailable portions of video were lost as a result of state action.

The trial court did not make specific findings on this point, and the parties do not argue in their briefs whether the first element of a due process violation was met. *See Eason*, ¶ 37. Because this issue was not presented to us and we may decide this issue on other grounds, we assume without deciding that the state destroyed the evidence.

¶ 16　Regarding the second element — whether the evidence had an exculpatory value that was apparent before it was destroyed — Muniz argues that we must defer to the trial court's finding that "law enforcement knew there was exculpatory and relevant information on the videos." We disagree.

¶ 17　To the extent this is a factual finding, we conclude it is unsupported by the record. The investigating detective testified at the hearing that he did not know if the surveillance system "picked up anything else in relationship to this or any other crime" and did not "know what it would have shown." We see no other evidence in the record suggesting that police knew the unavailable portions of video evidence were exculpatory. Because the court's finding to the contrary is without support in the record, we conclude it was clearly erroneous. *See Martinez v. People*, 2024 CO 6M, ¶ 34.

¶ 18    To the extent the trial court's finding that the lost evidence had an apparently exculpatory value was a legal conclusion, we disagree.  Muniz argues that police knew the entire video was exculpatory because it showed patrons arriving at the bar and would have shown whether or not Ames and Garfio were searched. But evidence of a search did not tend to establish Muniz's innocence.  At most, the video of Ames and Garfio arriving at the bar would have shown (1) that they were patted down and found to be unarmed or (2) that they were not patted down and therefore *might have* been armed.  That is, even if the video showed Ames and Garfio were not subjected to a pat-down, it would not illustrate that they were necessarily armed.[1]  Muniz's argument that the video would have established whether Ames and Garfio were armed is therefore speculative.

¶ 19    Moreover, whether Ames and Garfio were armed inside the bar had no bearing — let alone an apparently exculpatory one — on

---

[1] Indeed, Ames's uncle testified that Ames typically kept his gun "on his hip in the holster" but left it in the car because security was frisking patrons at the bar.  Muniz also testified that he pulled "an item" (which he would not identify as a gun) out of Garfio's waistband.

whether Muniz acted in self-defense when he shot Ames later in the parking lot. *See Castillo v. People*, 2018 CO 62, ¶ 38 (self-defense using deadly physical force requires a reasonable belief that such force was necessary to prevent an *imminent* risk of deadly harm). We therefore conclude it was not reasonably foreseeable to police that the footage was exculpatory. *See Braunthal*, 31 P.3d at 172.

¶ 20 If the video was only potentially useful to the defense, the trial court properly determined that Muniz failed to establish bad faith. *See Eason*, ¶ 38; *see also People v. Dyer*, 2019 COA 161, ¶ 39 (we may affirm a lower court's decision on any ground supported by the record). At the hearing on Muniz's motion to dismiss, the investigating detective testified that he attempted to download the entirety of the surveillance video from the night of the incident, but "[i]t was providing errors." He testified that, in an attempt to problem solve, he "ended up taking a 20-minute time frame" to cover the most relevant time frame and was "100% surprised" to discover there were no other videos on the system when he went back to conduct a more thorough review. He further testified that he sought multiple forms of assistance to attempt to fix the problem. Because this testimony supports the trial court's

conclusion that law enforcement did not act in bad faith, Muniz is not entitled to relief.[2]

### III. Prosecutorial Misconduct

#### A. Standards of Review and Reversal

¶ 21    Reviewing a claim of prosecutorial misconduct involves a two-step inquiry. *People v. Rhea*, 2014 COA 60, ¶ 40. We first determine whether misconduct occurred based on the totality of the circumstances. *Id.* If we conclude it did, we determine whether it warrants reversal according to the proper standard of review. *Id.*

¶ 22    We review a preserved claim of prosecutorial misconduct for an abuse of discretion and "will only reverse if there is a reasonable probability that the error contributed to the defendant's conviction." *People v. Monroe*, 2018 COA 110, ¶ 11, *aff'd*, 2020 CO 67.

---

[2] We reach this conclusion because Muniz has not established that the evidence was apparently exculpatory or that police acted in bad faith. But we note that Muniz does not argue in his opening brief — let alone establish — that "he was unable to obtain comparable evidence by other reasonably available means." *People v. Eason*, 2022 COA 54, ¶ 37; *see also People v. Braunthal*, 31 P.3d 167, 173 (Colo. 2001) (all three elements must be met). Nor does he challenge the trial court's finding that, while he could not "obtain comparable *video* evidence," he could conduct "other means of investigation, including witness interviews [of] the people who were [there] that night and what they saw." (Emphasis added.)

¶ 23    We review unpreserved claims of prosecutorial misconduct for plain error, and we will not reverse unless the misconduct was obvious and substantial, casting serious doubt on the reliability of the judgment of conviction. *Hagos v. People*, 2012 CO 63, ¶ 14.

### B.    Preserved Arguments

#### 1.    Applicable Law

¶ 24    During closing argument, a prosecutor has wide latitude to comment on the strength and significance of the evidence, as well as conflicts in that evidence, and to argue all reasonable inferences that may be drawn from evidence in the record. *Rhea*, ¶ 46. However, a prosecutor may not intentionally misstate or misinterpret the law, refer to facts not in evidence, or make arguments that are calculated to appeal to the jury's prejudices. *Id.* at ¶ 47; *see also People v. Cuellar*, 2023 COA 20, ¶ 66. Nor may a prosecutor suggest that the defense has presented its case in bad faith or make remarks for the purpose denigrating defense counsel. *People v. McMinn*, 2013 COA 94, ¶ 62.

#### 2.    Additional Facts

¶ 25    Muniz objected to the following statements by the prosecutor during closing argument:

- "The surveillance video is critical for you for purposes of analyzing Mr. Muniz's fantastic tale of how he rescued a bar full of people."

- The following statements referring to defense counsel's attempt to admit evidence under an exception to the prohibition against hearsay: "[T]hat isn't evidence. That was something to try to get you to take the guy who was dealing drugs and link them up with Mr. Ames. It's a smear attempt at a dead man."[3]

- "You heard that Mr. Muniz is a shotcaller . . . . [H]e's the shotcaller of that gang . . . ."

### 3. Discussion

¶ 26    Muniz argues that he is entitled to a new trial because these comments belittled him, denigrated defense counsel, and mischaracterized the evidence. We are not persuaded.

---

[3] This comment referred to the prosecutor's objection to hearsay when Muniz testified that a man named Alexander Moore — who had drugs in his car — told him he was friends with Ames. Defense counsel argued that the statement was offered for its effect on the listener, and the trial court overruled the objection.

¶ 27    The prosecutor used the word "fantastic" to describe Muniz's account while arguing that the physical evidence did not support Muniz's testimony that the gun accidentally went off on the fifth shot.  He went on to argue that the surveillance video supported the prosecution's theory and belied Muniz's claim of self-defense.  Because these statements were anchored in the facts in evidence, they were not improper.  *See Rhea*, ¶ 46.

¶ 28    Likewise, the prosecutor's characterization of Muniz as a "shotcaller" was a reasonable inference drawn from the evidence.  A security guard made a prior statement to police that there were "two shotcallers" at the bar on the night of the incident.  One of Muniz's friends testified that some people think there are "a couple shotcallers" in NSM.  And two security guards testified that they looked to Muniz and Manzanares to help keep the NSM group under control, with one testifying that he identified them as "the people who were most highly respected in that bar area with that group of people."  In response to Muniz's objection, the trial court also properly instructed the jury to use its own memory of the testimony at trial.

¶ 29    We agree with Muniz that the prosecutor's statement that defense counsel made a "smear attempt at a dead man" was improper.  This statement improperly implied that defense counsel presented her case in bad faith and appears calculated to inflame the passions of the jury.  *See McMinn*, ¶ 62; *Domingo-Gomez v. People*, 125 P.3d 1043, 1052 (Colo. 2005).  Therefore, the trial court erred by allowing it.

¶ 30    Nevertheless, the error was harmless.  The prosecutor's comment, while improper, was brief and isolated, and he did not return to it.  *See United States v. Delgado*, 672 F.3d 320, 338 (5th Cir. 2012) (en banc) (a single statement at closing will rarely justify reversal).

¶ 31    Furthermore, the evidence against Muniz was strong.  According to timestamps on the bar's surveillance video footage, the time between when security deployed pepper spray and when Muniz fired his first shot was five seconds.  Muniz testified that during this time — that is, after he saw a cloud of pepper spray moving in the wind — he (1) saw a man point a gun at Manzanares' head and pull the trigger four times; (2) ran up to the man; (3) punched him to the ground; (4) punched him twice more on the ground; (5) grabbed the

13

gun; (6) moved to the place where he saw Ames pointing his gun; and (5) then shot. The prosecutor emphasized that this account was not credible in view of the physical evidence, particularly given that it would have taken some time for the cloud of pepper spray to move through the parking lot before Muniz saw it.[4]

¶ 32    In light of this evidence, we conclude there is no reasonable probability that the prosecutor's single improper comment contributed to Muniz's convictions. *See Monroe*, ¶ 11.

### C.    Unpreserved Arguments

¶ 33    Muniz also argues that the trial court plainly erred by allowing the prosecutor to make generic tailoring arguments, comment on sentencing, refer to facts not in evidence, and belittle the defense. We disagree.

---

[4] Casting further doubt on Muniz's theory that he acted in self-defense, Muniz's wife posted a photo of Bonnie and Clyde on Facebook shortly after Muniz was arrested. The photo showed the couple armed, back-to-back against a circle of police officers. Muniz's wife testified that she was aware they "were an outlaw couple that positioned themselves contrary to the police."

## 1. Generic Tailoring

### a. Applicable Law

¶ 34 A prosecutor may not make generic tailoring arguments by attacking the defendant's credibility based simply on his presence at trial and resultant opportunity to tailor his testimony. *Martinez v. People*, 244 P.3d 135, 141 (Colo. 2010). However, a prosecutor may argue that a defendant has specifically tailored his testimony to particular evidence introduced at trial. *Id.* Tailoring arguments are specific and therefore appropriate "when the prosecutor cites to an evidentiary basis in the record." *Id.*

### b. Additional Facts

¶ 35 During cross-examination, the prosecutor asked Muniz, "Your story's changed quite a bit since [your police interview], hasn't it?" He pointed to the fact that, at that time, Muniz "didn't have a lot of information about the evidence that was collected" against him and "now, several months later," knew all the evidence that was collected. The prosecutor continued, "You now know the physical evidence . . . . That four shots were shot in rapid succession . . . . And then about 10 seconds later, there's a single shot fired from

that same gun, right?"  He repeated, "This is all the information that you didn't have . . . when you were arrested."

¶ 36     During closing argument, the prosecutor also argued the following:

- "Mr. Tocarciuc gave a statement.  He did so immediately . . . .  He did this without the benefit that [Muniz] got which is 13 days to hear about what everybody else saw and heard . . . .  He did this without the benefit of watching the surveillance camera a lot and matching up his story to that camera."

- "The shortest summary of [Muniz]'s testimony is that his stories are vague.  They're a reflection of access to information."

- Muniz's statements to police were not credible, "[u]ntil he ha[d] a chance to review all the evidence."

- "Mr. Muniz can't escape the truth.  That's why his testimony matches the physical evidence because he cannot escape it."

## c. Discussion

¶ 37    With one exception, we conclude that the prosecutor's tailoring arguments were specifically linked to the evidence and therefore proper.  Rather than being generally based on Muniz's presence at trial, the questions during cross-examination properly drew the jury's attention to the inconsistencies between Muniz's initial statements to police — when he evaded questions and did not mention shooting a gun — and the detailed self-defense argument he presented at trial.  *See Martinez*, 244 P.3d at 141 (a prosecutor may properly point to inconsistencies between a defendant's statements to police and testimony at trial).

¶ 38    Likewise, the arguments that Muniz's testimony was based on having watched the surveillance video, reviewed all the evidence, and ensured that his story matched the physical evidence were properly specific.  These comments contrasted Muniz's vague statements to police with his testimony at trial and were linked to

an evidentiary basis in the record — namely, the surveillance video and other physical evidence.[5]  *See id.*

¶ 39   By contrast, we conclude that the argument that Muniz's testimony was "a reflection of access to information" improperly attacked his credibility based solely on his presence at trial.  *See id.* But while this comment amounted to improper generic tailoring, the error was not plain.  Particularly when viewed in the context of the prosecutor's multiple proper specific tailoring arguments, this single generic tailoring comment was not so obvious that the trial court should have been able to avoid it without the benefit of objection. *See People v. Pollard*, 2013 COA 31M, ¶ 39; *see also People v. Walker*, 2022 COA 15, ¶ 28 (prosecutorial misconduct must be "flagrantly, glaringly, or tremendously improper" to require reversal for plain error (quoting *People v. Dominguez-Castor*, 2020 COA 1, ¶ 85)).  And, in view of the strong evidence against Muniz at trial — including the inconsistencies between his initial statements to

---

[5] The prosecutor's argument that Muniz had thirteen days to develop his story was not a tailoring argument at all.  This comment referred to Muniz's ability to shape his account based on information obtained between the shooting and his custodial interview, not based on his presence at trial.

police and his later testimony — we cannot conclude this single comment casts serious doubt on the reliability of the jury's verdict. *See Hagos*, ¶ 14. Indeed, the jury's split verdict, finding Muniz not guilty of attempted murder, reflects that it considered the evidence and was not unduly influenced by a fleeting instance of generic tailoring.

### 2. Remaining Unpreserved Arguments

¶ 40    We are not persuaded that the following arguments resulted in plain error:

- "[I]t's natural for a jury to wonder why Mr. Muniz is being charged with two counts of murder relative to each victim . . . . [F]or purposes of your consideration, the sentences will merge."

- "The absence of live .45-caliber rounds lying around the scene which had to have happened if Mr. Ames cocked his gun multiple times."

- The following statement referencing a photo of a gun magazine with a red substance splattered on it: "This is Mr. Ames' magazine . . . . Now, . . . how does this blood get up here? If he had the gun out all along, how would

there be blood on the inside of the gun?"  "If there was blood on that magazine, we knew exactly when that gun was picked up."

- "It is incredible; that is to say not credible, that the only man who sees a gun is [Muniz] and his wife and his wife's best friend.  Packed multiple times."

- The following statement referring to testimony that Muniz wears red, white, and blue because he is a patriot and Republican: "The patriot and Republican thing is absurd."

- "[Self-defense] isn't a story full of riddles and could-bes and nonresponses and games."

- "He fired that gun four times yet gives you this fantastic story of the minute that leads up to that . . . ."

¶ 41     To be sure, a jury "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"  *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)).  But while the prosecutor referenced sentencing, he did not point to any particular sentence or suggest that the jury should base its decision on the sentence

20

Muniz would receive.[6] *See id.* (The risk is that "providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."). Therefore, the prosecutor's comment on sentencing was neither obviously improper nor substantial. *See Hagos,* ¶ 14.

¶ 42     Muniz also argues that the prosecutor mischaracterized the evidence by arguing that Ames did not "cock[] his gun multiple times" and that there was blood on his magazine. But even if Muniz didn't clearly testify that Ames cocked his gun multiple times, he did testify that he saw Ames "cock the gun [in the middle of the alley], . . . . and he kind of moves in [and as he's on the driver's side of a car,] [h]e cocked and pointed it pretty fast." In light of this testimony, the prosecutor's summary of the evidence was not so obviously improper that the trial court should have intervened sua sponte. *See Pollard,* ¶ 39.

_____

[6] The trial court also repeatedly instructed the jury that closing arguments are not evidence and that it should base its decision on the evidence introduced at trial.

¶ 43    Likewise, the comment regarding blood on Ames's magazine was a reasonable inference drawn from the photograph presented to the jury and a crime scene investigator's testimony that "[w]e would assume it was a blood-like substance." *See Rhea*, ¶ 46. While Muniz points to conflicting evidence that Ames's arm was shattered, the jury was able to weigh the evidence before it, and the prosecution was entitled to emphasize the evidence that supported its case.

¶ 44    As discussed, the prosecutor's description of Muniz's testimony as "fantastic" and "not credible" was an appropriate comment on the strength of the evidence refuting his account. *See Domingo-Gomez*, 125 P.3d at 1051. Similarly, the description of his testimony regarding why he wears red, white, and blue as "absurd" was not improper. The prosecutor made this comment in the context of pointing to a photograph of Muniz and other NSM members dressed in red and arguing that "[r]ed is obviously the color." It was therefore a proper reference to the evidence.[7]

---

[7] We do not consider Muniz's argument that this comment was also a mischaracterization of the evidence because he makes it for the first time in his reply brief. *See People v. Allman*, 2012 COA 212, ¶ 14 n.3.

¶ 45 Finally, in view of the video recording of Muniz's custodial interview, we see no error in the prosecutor's description of his story as "full of riddles and could-bes and nonresponses and games." Muniz specifically told police that he was going to "speak to [them] in could-bes." He was nonresponsive to multiple questions and repeatedly put questions back on police, asking, "What do you think happened?" During cross-examination, Muniz further testified that he "wanted to give [the police] hints" during his interview and was "laying a trail for them to figure it out." We therefore conclude this statement, too, was a proper comment on the evidence. *See Rhea*, ¶ 46.

## IV. Admission of Gang Evidence

### A. Applicable Law

¶ 46 Unless otherwise prohibited, all evidence is admissible if it is relevant — that is, if it tends to make the existence of any consequential fact more or less probable than it would be without the evidence. CRE 401; CRE 402; *Rojas v. People*, 2022 CO 8, ¶ 25. But relevant evidence can be excluded if (1) its probative value is substantially outweighed by the danger of unfair prejudice, or (2) it is used to prove the character of a person in order to show that he

or she acted in conformity with that character on a particular occasion. *People v. Trujillo*, 2014 COA 72, ¶ 56 (citing CRE 403 and CRE 404(b)).

¶ 47     "[B]ecause 'gangs are regarded with considerable disfavor by our society,' gang-related evidence must be 'admitted with care.'" *Id.* at ¶ 72 (quoting *People v. Morales*, 2012 IL App (1st) 101911, ¶ 40). Where such evidence is extrinsic to the charged offense and suggestive of bad character, it is admissible if it is (1) logically relevant; (2) to a material fact; (3) independent of the prohibited inference of the defendant's bad character; and (4) the probative value of the evidence must not be substantially outweighed by the risk of unfair prejudice. *Rojas*, ¶¶ 27, 52; *see also People v. Spoto*, 795 P.2d 1314, 1318-19 (Colo. 1990).

¶ 48     We review the admission of evidence for an abuse of discretion. *Trujillo*, ¶ 60. A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.*

### B.     Additional Facts

¶ 49     Before trial, the trial court concluded the following evidence was admissible as res gestae: evidence that Muniz and Manzanares were part of NSM; that the fight in the bar began because members

of NSM felt disrespected by Ames and Garfio; that the bar was widely known as an NSM bar; and that part of NSM culture is that "when you mess with one of them, you mess with all of them." The court concluded that this evidence illustrated Muniz's motive to shoot Ames and provided context for why many witnesses were noncooperative with the investigation. It also found that the relevance of this evidence was not outweighed by the danger of unfair prejudice.

¶ 50 At trial, the prosecution introduced evidence from multiple witnesses that the bar where the shooting occurred is frequented by NSM members; that Muniz and Manzanares were part of NSM; that other witnesses were also associated with NSM or with other gangs; that Ames and Garfio were not affiliated with NSM; and that NSM members wore similar colors and logos and used certain gang signs. It also introduced evidence that when you mess with one NSM member, you mess with all of them, and that, on the night of the incident, there was gang-related tension in the bar. The prosecutor also emphasized this evidence during closing argument, arguing that there was "a turf war," and the gang evidence proved that "disrespect" was the motivation for the shooting.

## C.     Discussion

¶ 51     We conclude that the trial court did not abuse its discretion by admitting limited gang-related evidence in this case.[8]  Despite Muniz's arguments to the contrary, there was substantial evidence that the shooting began as a gang-related dispute.  Ames's uncle testified that he believed "[s]omething [was] about to go down" when a group of NSM members lined up and were "[m]ad-dogging" Ames, with one of them saying, "[H]e's disrespecting me."  A police officer responding to the scene testified that security guards advised him "it was a gang fight."  And Tocarciuc testified that on the night of the incident, "there was tension, a lot of tension in the air and people were posturing" and using "gang signs."  Because this evidence served to directly prove the charged offenses (i.e., by proving Muniz's state of mind just before the shooting and his

---

[8] Although the court admitted the evidence as res gestae, a doctrine that has since been abolished, the evidence was otherwise admissible.  *See Rojas v. People*, 2022 CO 8, ¶ 41; *see also People v. Gonzalez-Quezada*, 2023 COA 124M, ¶ 31 (we may affirm a trial court's evidentiary ruling on any basis supported by the record).

26

motive to shoot Ames), it was intrinsic evidence exempt from analysis under Rule 404(b).[9] *See id.* at ¶ 52.

¶ 52　　We are not persuaded that the other gang-related evidence was suggestive of bad character. The testimony at trial related to generic information about NSM and gang dynamics (such as the value placed on respect). None of it pertained to other bad acts or acts of violence committed by Muniz or other members of NSM. *See Rojas*, ¶ 52 (if extrinsic evidence does not suggest bad character, Rule 404(b) does not apply, and admissibility is governed by Rules 401-403).

¶ 53　　Moreover, evidence that Muniz and others at the bar were members of NSM, and that NSM members respond to disrespect as a group, was highly relevant to prove that Muniz was motivated to shoot Ames because he and Garfio disrespected NSM. *See Trujillo*, ¶¶ 72, 74, 80 (while gang evidence may not be used as a backdoor means of associating the defendant with the gang and describing

---

[9] Muniz does not assert that any intrinsic evidence was inadmissible under CRE 403 or otherwise. In any event, like the extrinsic evidence discussed in greater detail below, we conclude the probative value of this evidence was not substantially outweighed by any danger of unfair prejudice.

the gang's bad acts, testimony about gang affiliation may be admissible to prove motive). And because evidence related to motive is crucial in a case involving self-defense, its probative value was not substantially outweighed by the risk of unfair prejudice. *See Rojas*, ¶ 27. The trial court also properly instructed the jury that it could not infer Muniz's guilt based on his mere association with a gang. Accordingly, we discern no error.

## V. Evidentiary Rulings

¶ 54 Muniz next argues that other "questionable evidentiary rulings" deprived him of a fair trial. He asserts that the court "almost reflexively" sustained prosecution objections while overruling meritorious defense objections, impermissibly limited his ability to cross-examine witnesses, and allowed the jury to be misled.

¶ 55 But while Muniz's opening brief includes a lengthy string cite to examples of apparently unfair treatment at trial, he does not explain how any of the trial court's "reflexive" evidentiary rulings were an abuse of discretion. Because this is an undeveloped assertion of error lacking support in legal authority, we decline to address it. *See People v. Lowe*, 2021 CO 51, ¶ 20 n.4.

¶ 56　　Likewise, we reject as undeveloped Muniz's claims that the trial court misled the jury by allowing testimony that (1) the case would have been dismissed if Muniz made a viable self-defense claim during his custodial interview, and (2) Muniz's wife didn't come forward with evidence that Ames was holding a gun before trial.  Muniz's arguments on these points are conclusory.  He presents no citation to legal authority and does not develop any argument regarding why this testimony was improper.  *See People v. Sanders*, 2023 CO 62, ¶ 18 (rejecting conclusory arguments made without "any legally supported argument" or citation to relevant authorities).

¶ 57　　Muniz lends more development to his argument that the court improperly restricted him from cross-examining witnesses who testified that Ames lawfully possessed a gun.[10]  But, again, he does not explain why the trial court's rulings regarding this evidence

---

[10] He points to his right under the Confrontation Clause to conduct effective cross-examination in his opening brief and, in his reply brief, asserts that the court allowed the prosecution to paint Ames as a law-abiding citizen even when this was false.

were improper.[11]  In any event, even if we assume without deciding that the trial court erred, any error was harmless.  It was not disputed that Ames had a gun in his possession at the time of the shooting.  Whether or not he lawfully owned a gun had no relevance whatsoever to whether Muniz shot him in self-defense.  And the testimony suggesting lawful gun ownership was brief and not emphasized during closing argument.  We therefore conclude that the court's evidentiary rulings did not substantially influence the verdict or affect the fairness of the trial proceedings.[12]  *See Hagos*, ¶ 12.

---

[11] For example, Muniz does not discuss the trial court's ruling that, while Ames had previously been involved in a domestic violence incident, evidence of that incident was inadmissible because the case had been dismissed, and the relevant law preventing ownership of a gun was not in place when it occurred.  Nor does he address the court's conclusion that asking whether "it is legal to have a gun while you are drunk" would go to whether or not the victim committed an uncharged crime, which was not relevant.  The trial court also permitted Ames's uncle to testify that he believed Ames had a permit for his gun, but it noted that this testimony was limited to personal belief and defense counsel could cross-examine on that point.

[12] For the same reasons, any error under the Confrontation Clause, which Muniz did not preserve, could not have been plain error.  *See Hagos v. People*, 2012 CO 63, ¶ 14; *see also Kinney v. People*, 187 P.3d 548, 559 (Colo. 2008) (even under the Confrontation Clause, judges have wide latitude to impose reasonable limits on cross-examination based on concerns about relevance).

30

## VI.　Time Restrictions

### A.　Standard of Review

¶ 58　Whether to grant or deny a motion for a continuance falls within the trial court's discretion. *People v. Brown*, 2014 CO 25, ¶ 19 (there are no mechanical tests for denying a continuance). A trial court also has wide discretion in conducting a trial, including determining the order and presentation of evidence and the scope of closing arguments. *People v. Hall*, 2021 CO 71M, ¶ 16.

### B.　Discussion

¶ 59　Muniz argues that the trial court unreasonably restricted his right to present a defense by denying his motion to continue, placing unreasonable time restrictions on his presentation of evidence, and limiting the parties' closing arguments to thirty minutes. But he makes no specific argument regarding the detailed reasons the trial court provided for denying a continuance in its

thoughtful written order.[13]  Based on the totality of the circumstances considered by the court, we cannot conclude that its decision was manifestly arbitrary, unreasonable, or unfair.  *See Brown*, ¶ 20.

¶ 60    We further conclude the trial court did not improperly halt defense questioning or impose a "clock trial" in an effort to complete trial before the end-of-year holidays.  True, "[f]ew rights are more fundamental than that of the accused to present witnesses in his own defense, and to put before the jury evidence that might influence the determination of guilt." *People v. Richards*, 795 P.2d 1343, 1345 (Colo. App. 1989) (citation omitted).  But in order to meet situations as they arise, the trial court "must have broad power to cope with the complexities and contingencies inherent in the adversary process." *People v. Walden*, 224 P.3d 369, 376 (Colo. App. 2009) (quoting *Geders v. United States*, 425 U.S. 80, 86

---

[13] The court denied the motion after weighing its own calendar, the prejudice to the prosecution based on a difficulty subpoenaing witnesses, the fact that counsel had already accepted the dates which were set to be complete before the end-of-year holidays, the fact that the court had already made accommodations to give additional time to the parties, and Muniz's unwillingness to waive his right to a speedy trial.

(1976)).  Once again, Muniz does not address the specific rulings the court made to ensure the timely completion of trial.[14]

¶ 61    Moreover, while Muniz argues that the court's time restrictions limited his ability to present a complete defense, he does not specify what additional testimony he would have offered if given more time. *See People v. Johnson*, 30 P.3d 718, 726 (Colo. App. 2000) (unless prejudice is shown, error may not be predicated on discretionary rulings related to how the trial court conducts a trial).[15]

---

[14] Based on our review of the record, the court properly exercised its discretion to limit defense counsel from "going line by line through [Muniz's] entire [custodial] interview" during cross-examination; to allow the prosecutor to play the recording of Muniz's custodial interview on redirect (and allow defense counsel to recross) because at least one juror was unable to understand it without a transcript; to limit testimony related to "thousands of jail calls" between Muniz and his wife because the questions were leading and counsel's questions were asked and answered; and to inform counsel that Muniz's redirect examination was going to eat into the time for closing arguments, particularly given that it had to repeatedly admonished him to answer the attorneys' questions without providing a narrative or addressing the gallery.

[15] For the same reason, we reject Muniz's argument that the trial court improperly limited closing argument to thirty minutes per side.  Muniz does not indicate how he would have used additional time for closing argument or cite to any authority indicating that a thirty-minute limit is an abuse of discretion. *See People v. Rodriquez*, 645 P.2d 857, 859 (Colo. App. 1982).

## VII. Cumulative Error

¶ 62    "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25; *see also People v. Vialpando*, 2020 COA 42, ¶ 67 ("[T]he ultimate question is whether the errors deprived the defendant of a fair trial."), *rev'd on other grounds*, 2022 CO 28, ¶ 10.

¶ 63    Of the many errors Muniz asserts on appeal, we have identified only three isolated instances of prosecutorial misconduct — one preserved and two unpreserved. These comments were brief and, in view of all of the evidence introduced at trial and the fact that the jury found in Muniz's favor on one of the charges, we conclude they did not individually or cumulatively deprive Muniz of a fair trial. *See Vialpando*, ¶ 67. Accordingly, reversal is not warranted.

## VIII. Disposition

¶ 64    The judgment is affirmed.

JUDGE TOW and JUDGE BERGER concur.