22CA0208 Peo v Walker 01-09-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0208
El Paso County District Court No. 20CR5068
Honorable Jessica L. Curtis, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

James Maurice Walker,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE YUN
Dunn and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 9, 2025

Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Tracy C. Renner, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    James Maurice Walker appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree murder. He challenges several of the district court's rulings on evidentiary matters and juror issues. We disagree with those contentions and affirm the conviction.

## I.    Background

¶ 2    At trial, the People presented evidence from which the jury could find the following facts. Gabe Garcia and the victim had been "inseparable" ever since they met and became best friends in school. "If I needed something," he testified, "she would help me."

¶ 3    In the summer of 2020, Garcia and the victim were both selling drugs. The victim introduced Garcia to Walker, who also sold drugs and was a member of the 81st Crips gang. Garcia and Walker started occasionally working together.

¶ 4    On July 28, 2020, a fellow gang member and friend of Walker's nicknamed "Bam" gave Garcia approximately $1,600 to buy a pound of marijuana. Bam, Garcia, and Hailie Batton-Robinson — Garcia's girlfriend and his driver that day — all met at an apartment complex for the drug deal. But when Garcia handed over the money to a third party, that person left and did not

return with the drugs.  When it became clear that Garcia had been robbed, Bam put a gun to Garcia's head and said he was going to shoot him.  Batton-Robinson interceded on Garcia's behalf and, according to Garcia, "saved [his] life."  Bam then said he would give Garcia a couple of hours to get the money back.

¶ 5     That night, Garcia and Batton-Robinson went to Walker's apartment.  Walker, the victim, and Walker's fiancee were also there.  Walker told Garcia that he had talked to Bam, that he had paid Garcia's debt, and that Garcia now owed the money to Walker.  Walker threatened Garcia, saying that Garcia "better pay him back" within "the next day or two" or there "would be worse consequences, and that's on Crips."  Walker then held a video call with gang members in California, who showed Garcia their guns and told him they would kill him if he did not pay Walker back.  Walker told Garcia there was "a green light on [his] head" and he was "a target" unless he paid the debt.

¶ 6     Shortly after midnight on July 29, Garcia texted the victim, begging her to lend him a pound of marijuana to repay Walker.  "U can literally save my life if u lent me the p for a day," he told her.

"[P]lease don't let me die."  The victim responded: "That's not going to happen."

¶ 7    On July 30, the victim brought marijuana to Walker's apartment "to try to settle the debt."  Walker and his fiancee were there, along with another gang member who had come out from California.  But the California gang member said that the marijuana "wasn't good" and that he would not accept it.  He then departed, leaving Walker, his fiancee, and the victim alone in the apartment.

¶ 8    The victim texted a friend: "I help hella help or they will me[.]  As much money as possible[.]  Or I'm gonna get killed[.]  Don't contact cops I pray u don't[.]"

¶ 9    That evening, the fiancee heard Walker and the victim arguing in the bedroom.  When they came out, the victim told the fiancee that Walker had forced her to play Russian roulette with him.  The argument continued in the living room.  As the fiancee watched, Walker pushed the victim onto the couch and shot her in the head.  When he stood up again, the fiancee saw "a clear fluid leaking" from the victim's head.  The fiancee begged Walker to let her leave, and he told her that she was "never there" and that she should not "say anything."  The fiancee called a friend to pick her up.  As she waited

3

for her friend, she saw Walker "dragging [the victim's] body out of the house by her wrist and stuffing her in the back seat of the car" Walker and his fiancee shared. But Walker could not find the car keys.

¶ 10 Later that night, Batton-Robinson, who, along with Garcia, had spent the last two days "trying to come up with the money," went to Walker's apartment to drop off money that she and Garcia had earned. When she arrived, Walker was cleaning. He asked whether he could borrow her car and "if he could clear everything out of it." When she asked why, he "joked about hiding a body." Batton-Robinson gave Walker her car keys, and he left.

¶ 11 The victim's body, with a single gunshot wound to the forehead, was discovered beside Highway 24 the next morning.

¶ 12 The next month, the fiancee attended a barbecue with Walker's stepfather. When she could speak to the stepfather alone, she told him that she had "watched [Walker] shoot somebody" and that "this involved drugs." Several weeks later, the fiancee called Walker's stepsister in tears. The stepsister met the fiancee outside Walker's apartment, where the fiancee told her that "she knew too much and that if something happened to her[,] then she just

4

wanted [the stepsister] to know that it was [Walker]." The stepsister went inside to confront Walker about why the fiancee was so upset. Walker said that she was upset because she had seen him kill someone. At that point, Walker's stepfather and stepsister went to the police.

¶ 13    Male DNA found on the victim's left hand was consistent with Walker's. And the victim's DNA was found in "presumptive" bloodstains on Walker's couch, in his car, and in Batton-Robinson's car.

¶ 14    The fiancee initially and repeatedly told the police that she had seen nothing. But the next summer, when she herself was arrested, she contradicted her prior statements and admitted that she had witnessed the murder. She explained the changed testimony at trial, stating that Walker had threatened to kill her and her family if she told on him and that she was scared those threats could be carried out by other gang members because she knew "what happens to snitches."

¶ 15    Batton-Robinson likewise was not forthcoming in her initial police interview, omitting any mention of the gang and the drug debt and claiming that she had used fabric paint on the back seat

of her car to give it some flare. Only after she too was arrested did she admit that she had used the paint to cover up what she believed were bloodstains. She explained at trial that she had kept quiet "[o]ut of fear" of "[t]he 81st Crips."

¶ 16    At trial, Walker argued that he had no motive to kill the victim and that the police had decided he was guilty without investigating other leads. The jury found him guilty of first degree murder, and the district court imposed the mandatory sentence of life without the possibility of parole.

## II.    Analysis

¶ 17    On appeal, Walker contends that the district court erred by (1) admitting evidence that he was a "threatening drug-dealing gang member"; (2) finding that the prosecution's exercise of a peremptory challenge against one of only two Black jurors on the venire was not racially motivated; (3) declining to excuse a juror who had contact with a testifying detective during trial; (4) failing to make specific findings that methods used to detect "presumptive" bloodstains were reliable and admissible under CRE 403; and (5) excluding evidence that the victim earned income as a sex worker and had contact with a client through an escort service website. He also

contends that these errors cumulatively require reversal. We address each contention in turn.

## A. Gang and Drug Evidence

¶ 18    Walker contends that the district court reversibly erred by admitting evidence of "gang affiliation, drug dealing, [and] threats by Walker." We disagree.

### 1. Additional Facts

¶ 19    Before trial, the prosecution filed notice of its intent to introduce, as res gestae, evidence that Walker killed the victim because he was responsible for collecting a "drug debt" on behalf of his gang. Walker objected, arguing that the gang and drug evidence was subject to CRE 404(b). The court disagreed and made an initial finding, subject to further argument by the parties, that the gang and drug evidence was admissible as res gestae because it was probative of Walker's motive and "pivotal" to understanding "the total picture surrounding the homicide."

¶ 20    The prosecution filed another motion, arguing that the gang and drug evidence was relevant because it explained (1) Walker's "conduct in this case[,] in which gang members acted in concert together to satisfy an unpaid drug debt"; and (2) "the fear and

7

reluctance of [the fiancee] to report the murder." After a hearing, the court finalized its prior ruling that the gang and drug evidence was admissible as res gestae:

> [A]s I understand it, the Prosecution's theory of the case is that [Walker] killed [the victim] because of a drug deal gone wrong and . . . there was motive to follow through with the murder because of threats that they believe [Walker] was making under the auspices of the 81st Crips; that the 81st Crips were putting a hit out on certain people because of the drug debt gone wrong. And so, to the extent that that is my understanding of the Prosecution's theory of the case, this . . . is res gestae evidence . . . .

¶ 21 The parties agreed that a limiting instruction would be read each time a witness testified about Walker's gang membership. The instruction stated:

> Guilt may not be inferred from mere association. Membership in a gang is not a crime. Therefore, your decision shall not be affected by evidence, without more, that the Defendant was a member of a gang. You are expected to carefully and impartially consider all of the evidence and follow the laws as stated by the Court.

¶ 22 The jury heard the following testimony:

- Walker was a member of the 81st Crips and sold drugs.

- Garcia sold drugs on behalf of Walker.

- When talking to Garcia about the drug debt, Walker made a death threat "on Crips."

- Witnesses, including the fiancee and Batton-Robinson, were afraid to come forward because of Walker's gang connections.

### 2. Governing Law and Standard of Review

¶ 23 At the time of Walker's trial, the admissibility of other act evidence was generally governed by two theories: CRE 404(b) and res gestae.

¶ 24 Under CRE 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove a person's character to show that the person acted in conformity with that character on a particular occasion. But evidence of other crimes, wrongs, or acts may be admissible for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." CRE 404(b)(2).

¶ 25 Res gestae, in turn, "is a theory of relevance which recognizes that certain evidence is relevant because of its unique relationship to the charged crime." *People v. Greenlee*, 200 P.3d 363, 368 (Colo. 2009), *abrogated by Rojas v. People*, 2022 CO 8. Res gestae

evidence is "generally linked in time and circumstances with the charged crime, forms an integral and natural part of an account of a crime, or is necessary to complete the story of the crime for the jury." *Id.* (quoting *People v. Quintana*, 882 P.2d 1366, 1373 (Colo. 1994)).

¶ 26 Two months after Walker's trial, the Colorado Supreme Court abolished the res gestae doctrine in criminal cases. *Rojas*, ¶ 4. In its place, the supreme court embraced "an intrinsic-extrinsic distinction." *Id.* at ¶ 44. On one hand, intrinsic acts — those that (1) directly prove the charged offenses or (2) occurred contemporaneously with the charged offenses and facilitated their commission — are not "other" acts and, therefore, fall outside the scope of CRE 404(b). *Id.* at ¶ 52. On the other hand, extrinsic acts that suggest a bad character (and thus a propensity to commit the charged offense) are admissible only as provided in CRE 404(b) and after the analysis set forth in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990). *Rojas*, ¶ 52.

¶ 27 In *Spoto*, our supreme court articulated a four-part test to determine whether other act evidence that suggests bad character is admissible. 795 P.2d at 1318. First, the evidence must relate to

a material fact. *Id.* Second, the evidence must be logically relevant to that material fact, meaning it must tend to make the existence of the material fact more or less probable. *Id.* Third, the logical relevance must be independent of the prohibited character inference. *Id.* Fourth, the evidence's probative value must not be substantially outweighed by the danger of unfair prejudice. *Id.*

¶ 28 A trial court has substantial discretion in deciding whether to admit evidence of other acts. *Perez v. People*, 2015 CO 45, ¶ 22. We will not disturb the court's decision absent a showing that it was manifestly arbitrary, unreasonable, or unfair, or was based on a misapprehension or misapplication of the law. *Gonzales v. People*, 2020 CO 71, ¶ 25. "In deference to the trial court's discretion, we must assume the maximum probative value and the minimum unfair prejudice to be given the evidence." *Yusem v. People*, 210 P.3d 458, 467 (Colo. 2009).

¶ 29 Even if the court abuses its discretion, we reverse only if the error was not harmless. *People v. Harris*, 2015 COA 53, ¶ 14; *see also Yusem*, 210 P.3d at 469 n.16 (The "[e]rroneous admission of CRE 404(b) evidence is not error of constitutional dimension."). A nonconstitutional error is harmless unless there is a reasonable

probability that it contributed to the defendant's conviction by substantially influencing the verdict or impairing the fairness of the trial. *Harris*, ¶ 26 (citing *People v. Casias*, 2012 COA 117, ¶ 62). A reasonable probability means a probability "sufficient to undermine confidence in the outcome of the case." *Casias*, ¶ 63.

¶ 30 The single most important factor in determining whether an error was harmless is whether the outcome of the case was close. *Harris*, ¶ 27. "If a case was close, there is a greater chance that the erroneously admitted evidence affected the jury's verdict." *Id.* "On the other hand, if the properly admitted evidence is sufficiently powerful, an appellate court can be fairly assured that the erroneously admitted evidence did not substantially sway the jury" to convict the defendant. *Id.*

### 3. Discussion

¶ 31 We first address the admissibility of the gang and drug evidence under CRE 404(b), then address its admissibility to explain why the fiancee and Batton-Robinson changed their stories. And finally, we address harmless error.

### a.     CRE 404(b)

¶ 32     The People argue that even though the gang and drug evidence is no longer admissible as res gestae and is considered extrinsic under *Rojas*, it should still be admissible under CRE 404(b), so reversal is unnecessary.  *See People v. Thompson*, 2020 COA 117, ¶ 55 n.7 ("We may affirm a district court's judgment on any ground supported by the record, even if the district court did not raise or address that ground.").  We agree.

¶ 33     "The first prong of the *Spoto* test is the easiest to satisfy." *Yusem*, 210 P.3d at 464.  A material fact is merely one "that is of consequence to the determination of the action."  CRE 401.  Here, according to the prosecution's theory of the case, the gang and drug evidence was related to Walker's motive for killing the victim.  *See People v. Clark*, 2015 COA 44, ¶¶ 15, 20 (Gang-related evidence is admissible to establish a motive and explain "why [a] defendant perpetrated a seemingly random and inexplicable attack.") (citation omitted).

¶ 34     To satisfy the second prong, the prosecution "need only show logical relevance — that the prior act evidence has *any* tendency to make the existence of the material fact more or less probable than

without the evidence." *Yusem*, 210 P.3d at 464-65. Here, the evidence that Walker dealt drugs as a member of the 81st Crips and made a death threat "on Crips" over a drug debt owed to him and the gang made it more likely that he was willing to kill the victim over that debt.

¶ 35    As to *Spoto*'s third prong, the gang and drug evidence was relevant to motive independent of the prohibited character inference — i.e., that Walker, as someone who sold drugs for a gang, had a criminal character and acted in accordance with that character when he killed the victim. "The third prong of the *Spoto* test does not demand the absence of the inference but merely requires that the proffered evidence be logically relevant independent of that inference." *People v. Snyder*, 874 P.2d 1076, 1080 (Colo. 1994). To the extent there was a character inference here, it was unrelated to the prosecution's argument that Walker killed the victim as a consequence for an unpaid drug debt owed to the gang. According to the prosecution's theory, the gang and drug evidence explained Walker's motive for killing the victim, an issue logically independent of his character in general.

¶ 36    The concern in this case is the fourth prong of the *Spoto* analysis — that is, whether the probative value of the gang and drug evidence was substantially outweighed by the danger of unfair prejudice. *See id.* As Walker notes, the gang and drug evidence did not directly prove that he killed the victim. Nor did the evidence obviously establish his motive, because it was Garcia who owed a drug debt to Walker and the gang, not the victim. It was Garcia who was robbed, who had "a green light on [his] head," and whom Walker threatened "on Crips." The prosecution's theory that Walker killed the victim "because he had to as a member of the gang[] because of the hit that was put out" does not, as Walker argues, appear to make much sense, considering that the hit was put out on *someone else*.

¶ 37    Nevertheless, there was considerable circumstantial evidence that supported the prosecution's theory that the victim's death was connected to the drug debt. First, Garcia sent a message to the victim asking for her help to get marijuana to pay the debt. Second, the victim tried to pay the debt by bringing marijuana to Walker's apartment. Third, she texted a friend shortly before her death to say that she needed "[a]s much money as possible" or she was going

15

to "get killed." And fourth, the fiancee told Walker's stepfather that she had "watched [Walker] shoot somebody" and that "this involved drugs." We thus consider the gang and drug evidence to have some probative value.

¶ 38    And we cannot say that the probative value was substantially outweighed by the danger of unfair prejudice. Although gang-related evidence must be "admitted with care" because "gangs are regarded with considerable disfavor by our society," *People v. Trujillo*, 2014 COA 72, ¶ 72 (citation omitted), the jury heard no evidence about the gang's reputation or culture, other acts committed by gang members, or Walker's involvement beyond the fact that he sold drugs, *see id.* (noting that "courts must be vigilant in guarding against the improper use of gang affiliation evidence 'as a backdoor means of introducing character evidence by associating the defendant with the gang and describing the gang's bad acts'") (citation omitted). Thus, while the gang evidence was prejudicial to Walker, the prejudice resulted from the "legitimate probative force of the evidence" and was mitigated by the court's instruction that guilt may not be inferred from gang association. *People v. Kembel,*

2023 CO 5, ¶ 53 (quoting *People v. Gibbens*, 905 P.2d 604, 608 (Colo. 1995)).

¶ 39    Giving the gang and drug evidence the maximum probative value and assuming the minimum unfair prejudice, *see Yusem,* 210 P.3d at 467, we conclude that the district court did not abuse its discretion by admitting the evidence.

### b.    Changes in Witness Statements

¶ 40    Separately, at least some of the gang evidence was admissible, as the prosecution argued, to explain why the fiancee and Batton-Robinson changed their stories. *See People v. James*, 117 P.3d 91, 94 (Colo. App. 2004) ("[E]vidence about gang retaliation, including fear thereof, is admissible to explain a witness's change in statement or reluctance to testify."); *Trujillo*, ¶ 57 (same); *People v. Chavez*, 2012 COA 61, ¶ 32 (same); *People v. Gonzales-Quevedo*, 203 P.3d 609, 615 (Colo. App. 2008) (same).  The fiancee testified that, "since what happened to [the victim] happened, [she] just felt like it was a matter of time for [her] as well"; that Walker was "really well respected" in the gang and had gang connections in "at least . . . two different states"; and that by testifying against him she was "signing [her] own death sentence."  Batton-Robinson

17

likewise testified that she initially lied to the police "[o]ut of fear" of "[t]he 81st Crips." The gang evidence put their fear in context and was relevant to their credibility because it explained why they changed their stories. *See People v. Villalobos*, 159 P.3d 624, 630 (Colo. App. 2006) (noting that evidence that a witness fears retaliation for testifying is admissible because it is relevant to the credibility of that witness).

### c.     Harmless Error

¶ 41     Finally, even if the district court abused its discretion by admitting some of the gang and drug evidence, we cannot conclude that a reasonable probability exists that the erroneously admitted evidence affected the jury's verdict.

¶ 42     This was not a close case. *See Harris*, ¶ 27. Rather, the evidence that Walker killed the victim was overwhelming. The fiancee watched Walker shoot the victim in the head, and she told Walker's stepfather and stepsister what she saw. The physical evidence supported her account: DNA consistent with Walker's was found on the victim's left hand, and the victim's DNA was found in "presumptive" bloodstains on Walker's couch, in his car, and in Batton-Robinson's car. And Walker told his stepsister that the

fiancee was upset because she had seen him kill someone. *See Pernell v. People*, 2018 CO 13, ¶ 25 ("[W]e have held evidentiary error to be harmless where the properly admitted evidence overwhelmingly shows guilt."). Finally, evidence that Walker was a member of the 81st Crips was properly admitted to explain the changes in witness statements. Given the strength of the properly admitted evidence, we "can be fairly assured that the erroneously admitted evidence did not substantially sway the jury" to convict him. *Harris*, ¶ 27.

¶ 43 For all of these reasons, we discern no reversible error.

## B. *Batson* Challenge

¶ 44 Walker contends that the district court violated his right to equal protection of the law, under *Batson v. Kentucky*, 476 U.S. 79 (1986), by allowing the prosecutors to dismiss one of only two Black jurors on the venire with a peremptory strike. We are not persuaded.

### 1. Additional Facts

¶ 45 During jury selection, one of the prosecutors exercised a peremptory strike against a prospective juror (Juror 59), and

defense counsel raised a *Batson* challenge. In response, the prosecutor stated:

> Your Honor, [Juror 59] is a teacher, and teachers are not amenable jurors for the [p]rosecution. That is the long and short of the rationale. . . . That's it for the rationale. She's a teacher.

¶ 46 Defense counsel stated that, in her opinion, Juror 59 was "the only other [B]lack member on the panel." She argued that the prosecutor's reason was pretextual because, if it were genuine, the prosecutors' position would be that "every teacher that is on this panel should be released." Although she did not specifically call the court's attention to any other teachers on the venire, the record shows that one of the prosecutors had previously objected when defense counsel challenged another teacher (Juror 60) for cause due to a scheduling conflict.

¶ 47 The following exchange then took place regarding Juror 59:

> THE COURT: You're going to have to elaborate for me. Why a teacher?
>
> [PROSECUTOR]: Your Honor, I did not even speak with her. I did not know what she looked like. In my experience . . . teachers are not good jurors for the [p]rosecution in the same way engineers are not.

. . . .

> THE COURT: Well, I'm struggling. You know, it's certainly a race-neutral explanation. The [p]rosecution doesn't believe that engineers and teachers are good for them. . . . [U]ltimately, I do find that it's a sufficient reasoning. The explanation is the [p]rosecution feels that engineers and teachers are generally not good for them.

¶ 48    The court denied the *Batson* challenge without completing the required analysis. Accordingly, the case was remanded for further findings. *See People v. Johnson*, 2024 CO 35, ¶ 22 (If the trial court's analysis "is inadequate to determine whether a violation has occurred, 'the appropriate procedure is to remand the case for more detailed findings by the trial court.'" (quoting *Craig v. Carlson*, 161 P.3d 648, 654 (Colo. 2007))).

¶ 49    On remand, the court reviewed the record and its notes on jury selection and made the following findings:

- The court understood the prosecutor's statement "regarding teachers being undesirable in the same manner as engineers as a reference to a genuine trial strategy to remove certain types of thinkers who may be more rigid and exacting from the deliberation room."

21

- Before exercising a peremptory challenge against Juror 59, "the prosecution had exercised three other peremptory challenges on teachers and engineers . . . , which the [c]ourt felt boosted the credibility of their strike as genuine rather than pretextual."

- The court "found the prosecution team credible, generally, in the way they responded to the *Batson* challenge . . . . They responded quickly and without hesitation as to their main concern with [Juror 59] being that she was a teacher. . . . The [c]ourt did not have any concerns with the prosecuting attorneys' demeanor during discussion of the issue; both appeared forthright and assured, rather than hesitant and/or insecure, while proffering that the juror's profession as a teacher was the essence of their reason."

- "The [c]ourt found the prosecuting attorney's statement that he did not know what [Juror 59] looked like to be credible, as the juror was seated on the far opposite side and several rows back from his position in a very crowded courtroom."

- The other prosecutor's previous objection to the removal of Juror 60 (another teacher) did not "raise[] credible concerns for the [c]ourt that the prosecution had given an improper and pretextual rationale" for the removal of Juror 59 because, "[i]n [the court's] experience, it is quite common for the prosecution's main strategy at the 'for cause' stage of jury selection to be preservation of a large enough jury pool for a full exercise of peremptory challenges for both sides." Indeed, the prosecutor commented that her reason for objecting to the removal of Juror 60 was that she didn't "want to run out of jurors."

¶ 50 Accordingly, after considering all the circumstances, the court found that defense counsel had not met her burden of showing purposeful discrimination by a preponderance of the evidence.

### 2. Standard of Review and Controlling Law

¶ 51 The Equal Protection Clause of the Fourteenth Amendment precludes a juror challenge based on race. *Batson*, 476 U.S. at 89. "Purposeful racial discrimination in selection of the venire violates a

defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Id.* at 86.

¶ 52    *Batson* provides a three-step process for evaluating claims of racial discrimination in jury selection. *Johnson,* ¶ 17; *People v. Austin,* 2024 CO 36, ¶ 7.

¶ 53    At step one, the opponent of a peremptory strike must make a prima facie showing that the proponent used the strike against a potential juror because of race. *Id.* at ¶ 18; *see also People v. Ojeda,* 2022 CO 7, ¶ 32 (removal of a single juror based on race, regardless of the composition of the final jury panel, violates equal protection). As long as the totality of the relevant circumstances raises an inference of racial motivation, the objecting party has satisfied their step-one burden. *Batson,* 476 U.S. at 96; *accord Valdez v. People,* 966 P.2d 587, 590 (Colo. 1998).

¶ 54    At step two, the proponent of the strike must offer a race-neutral explanation for the strike. *Johnson,* ¶ 19. At this second step, the court does not consider whether the explanation is "plausible or persuasive," but merely whether it is facially valid. *Id.*; *see also Ojeda,* ¶ 24 (The striking party may "provide any race-neutral justification for the strike, regardless of implausibility or

24

persuasiveness.").  In response, "[t]he objecting party may present evidence or argument to rebut the striking party's stated reason." *Johnson*, ¶ 19.

¶ 55    Then, at step three, the court must consider all of the circumstances that bear upon the issue of purposeful discrimination, including the striking party's demeanor, the reasonableness of the proffered race-neutral explanation, and whether the rationale is rooted in accepted trial strategy.  *Id.* at ¶ 20.  For a *Batson* challenge to succeed, the court must find that the objecting party proved purposeful discrimination by a preponderance of the evidence.  *Id.* at ¶ 21.

¶ 56    Different steps of the *Batson* analysis are subject to separate standards of review.  *Id.*  We review steps one and two de novo.  *Id.*  But we review the district court's ultimate step-three conclusion as to the existence of purposeful discrimination for clear error.  *Id.*  "Under this standard, we defer to the trial court's ruling 'so long as the record reflects that the trial court weighed all of the pertinent circumstances.'"  *Id.* (quoting *People v. Beauvais*, 2017 CO 34, ¶ 2).

### 3.    Analysis

¶ 57    Walker argues that when a case is remanded for further step-three findings, "a court should make findings necessary to complete the *Batson* analysis based on the existing record, not new observations or arguments."  The district court, Walker claims, crossed this line.  Specifically, he notes that the court did not explain at the time of trial that it understood the prosecution "was referencing an attempt to eliminate jurors they felt may bring particular types of analytical styles into deliberations" or that it believed the prosecutor's objection to dismissing Juror 60 for cause was motivated by a concern about running out of jurors.  Because the court did not "explain its reasoning at the time of the disputed ruling," he argues, it could not later do so on remand.

¶ 58    But when the district court's step-three analysis is inadequate to determine whether a *Batson* violation has occurred, the remedy is not automatic reversal but rather a remand for more detailed findings by the district court.  *Johnson*, ¶ 22.  However, "*Batson* remand hearings" should be confined to "fact finding related to events that occurred on the record and in front of the court."  *People v. Madrid*, 2023 CO 12, ¶ 43.  Unlike in *Madrid*, the district

26

court here did not permit additional argument or consider any new justification offered by the prosecution for the strike on remand; rather, it based its findings on the existing trial record and its own notes on jury selection. Nothing in *Johnson* or *Craig* prohibits the district court from relying on its own impressions and notes from the time of trial, and in this instance, as discussed below, the record supports the court's additional findings. We thus reject Walker's argument that those findings should be disregarded as "ad hoc justification[s]" simply because they include information that was not previously stated by the court.

¶ 59 The record on remand reflects that the district court weighed all of the pertinent circumstances, and it supports the court's conclusion regarding purposeful discrimination. *See Johnson,* ¶ 52. The court considered the prosecutors' demeanor and found both to be "forthright and assured," noting that the prosecutors "responded quickly and without hesitation" to the *Batson* challenge and that the prosecutor's statement that he did not know what Juror 59 looked like was credible given the layout of the courtroom. The court also found that the proffered race-neutral explanation referred to a "genuine trial strategy" of removing jurors who might be "more

27

rigid and exacting" in their thinking. Finally, the court found that the prosecutor's objection to the removal of Juror 60 did not lead it to believe that the race-neutral reason for striking Juror 59 was pretextual, for two reasons. First, the prosecutors had already exercised three other peremptory challenges on teachers and engineers.[1] And second, it was common in the court's experience for prosecutors to be concerned about preserving "a large enough jury pool for a full exercise of peremptory challenges for both sides."

¶ 60 We thus discern no error in the court's decision to deny Walker's *Batson* challenge.

### C. Juror's Contact with a Detective

¶ 61 Walker asserts that the district court reversibly erred by allowing a juror to continue serving on the jury after she had contact with a detective who later testified. We are not persuaded.

---

[1] Walker claims that nothing in the appellate record identifies those three jurors as teachers or engineers. But the sealed portion of the record, which is part of the appellate record, contains the juror questionnaires indicating the jurors' occupations and other personal information.

28

### 1. Additional Facts

¶ 62    On the third day of trial, one of the prosecutors informed the court that a detective who was scheduled to testify might have had contact with a juror. The prosecutor read the following email from the detective:

> On Tuesday, 12/7 evening, I had a friendly encounter in our parking structure with a lady who mentioned she had been selected for a jury this week. She actually couldn't find her car. I identified myself to her and offered assistance finding her car by giving her a ride in my assigned vehicle. We quickly found her car and that ended our interaction.
>
> She didn't mention, and I didn't ask, what case she was selected for. We didn't talk about anything except finding her car. . . .
>
> Yesterday at lunch I passed her on the street, and she didn't even seem to notice or recognize me.
>
> Let me know if you think this person is on the Walker jury and if there is anything else I need to do.

¶ 63    The court determined that this juror was on the panel. Defense counsel requested that she be replaced with an alternate because of her interaction with the detective. Defense counsel argued that the detective's credibility was at issue and, given this

friendly encounter, the juror might be biased in his favor.  The prosecutor objected, noting that the detective's expected testimony would be brief because he would testify only about the collection of surveillance footage and a receipt from a 7-Eleven.

¶ 64    The court brought the juror in for questioning.  The juror confirmed that the detective had helped her find her car.  At that time, she did not know that he was part of the case and she did not identify herself as a juror on the case.  She did not have a juror button yet.  She estimated that their interaction lasted five to seven minutes, and while she appreciated the detective's help, she indicated she would not have trouble remaining impartial about his testimony because she did not feel like she knew him.  She did not tell any of the other jurors about the interaction.  The court reserved ruling until after the detective testified.

¶ 65    After the detective testified, the court determined that the juror did not need to be released.  The court noted that defense counsel had not attacked the detective's credibility during cross-examination but instead "boosted" it by eliciting testimony intended to support the defense theory of the case.  It also found that the contact between the juror and the detective was minimal and that

the juror had been "unequivocal in her response that she would still be able to be fair and impartial" concerning the detective. Given the "minimal" prejudice, the court denied the request to replace the juror with an alternate.

### 2. Governing Law and Standard of Review

¶ 66 "[T]he purpose of seating an alternate juror is to have available another juror when, through unforeseen circumstances, a juror is unable to continue to serve." *People v. Christopher*, 896 P.2d 876, 879 (Colo. 1995). When an allegation of juror misconduct arises, a district court must conduct an inquiry. *Harper v. People*, 817 P.2d 77, 82 (Colo. 1991).

¶ 67 In determining whether to replace the juror with an alternate, the court must consider, among other things, the juror's assurance of impartiality, whether the extraneous communication was deliberate, and the prejudicial impact of the communication. *Christopher*, 896 P.2d at 879. The district court is in the best position to observe the juror's demeanor and evaluate whether the juror is able to serve. *People in Interest of D.F.A.E.*, 2020 COA 89M, ¶ 20. "Absent a showing that the juror was actually biased, we

must assume that she followed the court's instructions and decided the case based solely on the evidence and the law." *Id.* at ¶ 17.

¶ 68 The district court's decision to not excuse a juror is reviewed for an abuse of discretion. *Id.* at ¶ 16. A court abuses its discretion when its ruling is arbitrary, unreasonable, unfair, or contrary to law. *Id.*

### 3. Discussion

¶ 69 The district court did not abuse its discretion by declining to excuse the juror because the record supports its finding that the juror was fair and unbiased. The juror's contact with the detective was brief and inadvertent and, at the time of contact, neither was aware of the other's involvement in the trial. The juror assured the court that she would have no trouble remaining impartial because she did not feel like she knew the detective from their fleeting encounter. And Walker has not pointed to any evidence showing that the juror was actually biased as a result of her interaction with the detective. *See Christopher*, 896 P.2d at 879. Further, any residual positive feeling the juror might have harbored toward the detective would not have prejudiced Walker's case because the defense did not attack the credibility of the detective, but rather

asked the jury to find the detective credible given that his opinions supported the defense theory of the case.

¶ 70    Under these circumstances, the district court did not abuse its discretion by declining to replace the juror with an alternate.

### D.    Testimony Regarding Presumptive Bloodstains

¶ 71    Walker contends that the district court reversibly erred by failing to make findings regarding (1) the reliability of expert testimony about the methods used to detect "presumptive blood" and (2) whether the expert testimony was unfairly prejudicial under CRE 403.  We perceive no reversible error.

### 1.    Additional Facts

¶ 72    On the fourth day of trial, defense counsel objected to certain testimony regarding Bluestar, a reagent used to presumptively test for blood.  Counsel argued that Bluestar could "only indicate there's a biological material with blood that may be present" and certain substances could trigger "false positives."  Thus, counsel argued, it would be improper for the witnesses to testify that certain stains presumptively tested positive for blood because "further [laboratory] tests" were necessary "to determine if blood is even present." Defense counsel asked that the witnesses be precluded from

describing the Bluestar testing as revealing "presumptive blood" and instead be limited to the term "biological material." When the prosecutor disagreed, defense counsel argued that the term "presumptive blood" was misleading and prejudicial given the lack of confirmatory testing and requested a *Shreck* hearing.

¶ 73    The court denied the request for a *Shreck* hearing, finding that it was untimely because defense counsel had been on notice about the Bluestar reagent since the preliminary hearing ten months before trial but did not request a *Shreck* hearing until the middle of trial. The court also found that a hearing was unnecessary because Walker's "primary concern" was related to CRE 403 rather than "the scientific reliability of the principles that gave rise to presumptive positive tests for the presence of blood." It found that the probative value of the Bluestar evidence outweighed any unfair prejudice given that the Bluestar testimony was meant to highlight why law enforcement tested only certain pieces of evidence for DNA.

¶ 74    An investigator testified that crime scene investigation involves evidence documentation and collection. She said that "Bluestar is a tool that we use to search for latent bloodstains" and that "this is a

presumptive tool, meaning it is not confirming that the substance is blood, it's just merely a possibility that it is." She explained:

> When we do [Bluestar], we're looking for bloodstains that we call latent, and that means that it's not visible to the naked eye. So these are going to be bloodstains that are most likely cleaned up. In this case, we will mix the reagent and spray an area in order to see if there could potentially be a reaction. If there is, we will collect a swab or a sample.

She testified that because Bluestar reacts to the hemoglobin in blood, "it is considered a presumptive test specifically for blood," but that only a more formal laboratory test could confirm that the stains that had a Bluestar reaction were, in fact, blood. Her use of Bluestar revealed that the stains on Walker's couch cushion, area rug, and car floorboard and backseat were positive for presumptive blood. During cross-examination she acknowledged that Bluestar can react to other substances besides blood, including oil-based paint and root vegetables.

¶ 75 The serologist/DNA analyst testified that if she received items from the crime scene investigation that said "Bluestar positive," she did not perform any additional presumptive blood testing. But if certain items with red-brown stains were not labeled as Bluestar

positive, she would go ahead and perform a color metric test for presumptive blood. She said that "presumptive" means that "there can be false positives, so it's not a confirmation for blood, but it does give me some kind of indication as to whether blood is present or not." She explained that the purpose of these tests is to "find samples that are suitable for DNA testing that will hopefully produce a DNA profile so [that] I can give . . . the Court an idea of whose DNA might be present on an item of evidence." She testified that the presumptive blood samples from certain items collected from Walker's house and car and Batson-Robinson's car contained DNA that matched the victim's DNA profile.

2.     Standard of Review and Governing Law

¶ 76     We review a district court's decision about whether to admit expert witness testimony for an abuse of discretion and "will reverse only when that decision is manifestly erroneous." *People v. Cooper*, 2021 CO 69, ¶ 44 (quoting *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011)).

¶ 77     CRE 702 governs the admission of expert testimony. To determine whether such testimony is admissible, the trial court should "focus on the reliability and relevance of the proffered

evidence." *People v. Shreck*, 22 P.3d 68, 70 (Colo. 2001). The court must determine "(1) the reliability of the scientific principles [involved], (2) the qualifications of the witness, . . . (3) the usefulness of the testimony to the jury," and (4) whether the evidence satisfies CRE 403. *Id.*

¶ 78　A district court's "CRE 702 determination must be based upon specific findings on the record as to the helpfulness and reliability of the evidence." *Id.* at 78. The court "must also issue specific findings as to its consideration under CRE 403 as to whether the probative value of the evidence is substantially outweighed by its prejudicial effect." *Id.* Absent such specific findings "or a record not only supporting admission but virtually requiring it or precluding any reasonable dispute as to the basis of the court's admission, the trial court must be considered to have abused its discretion in admitting expert testimony." *Ruibal v. People*, 2018 CO 93, ¶ 14.

¶ 79　A district court's decision to admit expert testimony is reviewed under the nonconstitutional harmless error standard. *Id.* at ¶ 17; *People v. Wilson*, 2013 COA 75, ¶ 24. An error is harmless if a reviewing court can say with fair assurance that, in light of the

37

entire record, the error did not substantially influence the verdict or impair the fairness of the trial. *Wilson*, ¶ 24.

### 3.     Discussion

¶ 80     Walker argues that the district court "failed to make any findings on the record that either Bluestar utilized by [the investigator] or the 'color metric test' utilized by [the serologist/DNA analyst] were reliable and not unfairly prejudicial."

¶ 81     First, the district court did not abuse its discretion by failing to make findings on the reliability of Bluestar or the color metric test. In *Rector*, 248 P.3d at 1201-02, the supreme court held that the trial court was under no obligation to conduct a hearing or make specific findings regarding the reliability and potential prejudice of expert testimony under *Shreck* when no such objection was raised in the trial court. "In deciding whether a determination of admissibility requires a *Shreck* inquiry," the court explained, "a trial court must consider the issues as framed in the motion before it" and "cannot be expected to intuit the challenge brought by the parties." *Id.* at 1201. Noting that the defendant "chose to fashion the request for a *Shreck* hearing generally" and did not "submit a subsequent request for a *Shreck* analysis on the reliability or

potential prejudice of [the witness's] testimony," the court held that the trial court did not abuse its discretion when it denied the defendant's *Shreck* motion. *Id.* at 1202.

¶ 82    Here, the district court stated that, although defense counsel had requested a *Shreck* hearing, the court "really was left with an impression from the [d]efense [that] the primary concern was a [CRE] 403 analysis rather than [the] scientific reliability of the principles that gave rise to presumptive positive tests for the presence of blood." In response, defense counsel confirmed the court's understanding, stating that the "[d]efense's position is that this is a [CRE] 403 issue." Specifically, defense counsel argued that it was improper for the prosecution's witnesses to use the term "presumptive blood" because it was misleading and prejudicial under CRE 403 since no confirmatory tests were performed. Thus, the district court did not abuse its discretion by failing to make findings regarding the reliability of the Bluestar or color metric tests.

¶ 83    Second, contrary to Walker's contention, the district court did make findings under CRE 403. The court noted that the presumptive tests were accompanied by DNA testing that showed

39

that the victim's DNA was present in the stains and that this additional testing furthered the probative value of the testimony about presumptive blood. The evidence was further probative and helpful to the jury because the Bluestar evidence helped explain why law enforcement chose to send certain items for DNA testing. And the court acknowledged defense counsel's concern regarding prejudice by limiting the language witnesses could use: the witnesses were not permitted to refer to the stains as "bloodstains" but rather had to qualify that the stains were "presumptive blood." Accordingly, the district court found that the probative value of the expert testimony outweighed any unfair prejudice.

¶ 84     Finally, any possible error in admitting the testimony about "presumptive blood" was harmless. The investigator testified that Bluestar is "a presumptive tool, meaning it is not confirming that the substance is blood, it's just merely a possibility that it is." Likewise, the serologist/DNA analyst said that "presumptive" means that "there can be false positives, so it's not a confirmation for blood, but it does give me some kind of indication as to whether blood is present or not." And defense counsel conducted thorough cross-examination on the fact that the tests could not identify when

a presumptive bloodstain was created or whether the stain was definitely blood.

¶ 85　For all of these reasons, we conclude that the district court did not reversibly err by admitting the testimony about "presumptive blood."

## E.　Exclusion of Sex Work Evidence

¶ 86　Walker contends that the district court reversibly erred by precluding him from cross-examining law enforcement witnesses about the victim's history as a sex worker and their investigation of a man whom she met through an escort service website. We disagree.

### 1.　Additional Facts

¶ 87　During the investigation, law enforcement discovered that, in the week leading up to her death, the victim had a significant amount of communication with a man through an escort service website. Law enforcement interviewed the man but cleared him as a suspect because his cellular data supported his alibi that he was not in El Paso County when the victim was killed.

¶ 88　Before trial, the prosecution filed a motion in limine to exclude evidence that the victim had engaged in sex work through the

41

escort service website. In response, defense counsel argued that she had the right to question law enforcement's "investigation, lack of follow-up, [and] lack of due diligence." She explained that, while law enforcement interviewed the man and investigated his cell phone records, the man could have left his phone at home at the time of the crime, and law enforcement did not take further steps to clear the man as a suspect.

¶ 89 The court granted the prosecution's motion in limine to exclude evidence of the victim's sex work and affiliation with the escort service website, finding that the evidence was generally irrelevant and that, under CRE 403, any "marginal[]" relevance was substantially outweighed by the danger of unfair prejudice and confusion of the issues.

### 2. Standard of Review and Governing Law

¶ 90 The scope and limits of cross-examination are matters within the district court's sound discretion. *People v. Conyac*, 2014 COA 8M, ¶ 91. Absent a showing of an abuse of that discretion, we will not disturb the district court's evidentiary ruling. *Id.*

¶ 91 Although a criminal defendant is "entitled to all reasonable opportunities to present evidence that might tend to create doubt as

42

to the defendant's guilt," the right to present a defense "is generally subject to, and constrained by, familiar and well-established limits on the admissibility of evidence." *People v. Elmarr*, 2015 CO 53, ¶¶ 26-27.

¶ 92 Under CRE 403, relevant evidence may be excluded when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. CRE 403. When reviewing a district court's ruling under CRE 403, we give the evidence the maximum probative value attributable to it by a reasonable fact finder and the minimum unfair prejudice that may be reasonably expected from it. *People v. Vanderpauye*, 2023 CO 42, ¶ 59.

¶ 93 However, an erroneous evidentiary ruling may rise to the level of constitutional error if it deprived the defendant of any meaningful opportunity to present a complete defense. *Conyac*, ¶ 93. "A defendant's right to present a defense is violated only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *Id.*

¶ 94     We conclude that the district court did not abuse its discretion by excluding the evidence under CRE 403.  Walker specifically sought to introduce evidence that the victim was a sex worker who used an escort service website to meet a client.  This evidence was highly inflammatory and unfairly prejudicial because it impugned the victim's character.  And the probative value of the evidence was low.  Walker conceded that he was not offering the evidence as an alternative suspect defense.  Instead, the evidence was offered as part of a general denial defense questioning the police investigation for the "lack of follow-up" and "lack of due diligence."  Accordingly, the district court did not abuse its discretion by finding that the "marginal[]" relevance of the evidence was substantially outweighed by the danger of unfair prejudice and confusion of the issues.

¶ 95     Nor are we persuaded by Walker's argument that the district court's ruling deprived him of the right to present a defense.  The record shows that the defense explored the weaknesses of the police investigation throughout the trial.  The defense attacked the credibility of the fiancee and Batton-Robinson by pointing out that they had taken plea deals in exchange for their testimony and that

the fiancee gave six different statements to the police. Thus, Walker was not "denied virtually his only means of effectively testing significant prosecution evidence" by the court's exclusion of inflammatory testimony about the victim's history as a sex worker and her use of an escort service website. *Conyac,* ¶ 93.

## F. Cumulative Error

¶ 96 Walker contends that the numerous alleged errors, when taken together, show that he did not receive a fair trial. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25. Having assumed at most two errors for the purpose of our analysis, neither of which individually warranted reversal, we further conclude that the errors did not "collectively prejudice the substantial rights" of Walker to the extent that we should reverse his first degree murder conviction. *See id.*

## III. Disposition

¶ 97 The judgment is affirmed.

JUDGE DUNN and JUDGE MOULTRIE concur.